## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| GFRB, LLC, | ) | |
| | ) | |
| *Plaintiff/Counter-Defendant* | ) | |
| | ) | |
| v. | ) | No. 21 C 4051 |
| | ) | |
| WORTHY PROMOTIONAL | ) | Judge Virginia M. Kendall |
| PRODUCTS, LLC, | ) | |
| | ) | |
| *Defendant/Counter-Plaintiff.* | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant/Counter-Plaintiff Worthy Promotional Products, LLC ("Worthy") submits this First Amended Counterclaim ("FAC") and Second Amended Counterclaim ("SAC") against the Complaints filed by Plaintiff/Counter-Defendant GFRB, LLC ("GFRB"). (Dkt. 29; Dkt. 54). In the FAC, Worthy brings two claims against GFRB for GFRB's alleged failure to perform an agreement to supply hand sanitizers to Worthy. (FAC ¶ 1). Count I involves a breach of contract, and Count II involves a breach of express and implied warranties. (*Id.*). In the SAC, Worthy brings an additional breach of contract claim (Count III) against GFRB for GFRB's alleged failure to perform an agreement to supply EPA-registered disinfectant sprays to Worthy. (SAC ¶¶ 73-74). GFRB has moved to dismiss the FAC and SAC with prejudice for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 32; Dkt. 55). For the reasons given herein, GFRB's Motions to Dismiss are granted in part and dismissed in part.

1

## BACKGROUND

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations—but not its legal conclusions—with all reasonable inferences drawn in the non-moving party's favor. *Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). Unless otherwise noted, the following factual allegations taken from Worth's FAC and SAC are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Worthy, an Alabama company, provides household products such as paper towels, hand sanitizers, and bathroom cleaners to retailers for resale to consumers. (FAC ¶¶ 2, 6). GFRB, an Illinois company, sources and supplies products from international manufacturers into the U.S. (*Id.* ¶¶ 3, 7). On March 13, 2020, GFRB emailed to Worthy photographs of hand sanitizers that GFRB proposed to supply. (*Id.* ¶ 10). The photographs showed hand sanitizers that were clear in color, packed in specifically shaped and labeled bottles, and had pumps with straws that reached the bottom of the bottles. (*Id.*). That same day, GFRB also emailed a quote for the hand sanitizers and stated that GFRB would ship the products within 17 days after Worthy placed an order. (*Id.* ¶ 11). Relying on GFRB's representations of the attributes of the hand sanitizers, Worthy sent GFRB a purchase order for hand sanitizers containing 70% alcohol and specifying bottle sizes that matched those in GFRB's March 13, 2020 quote. (*Id.* ¶¶ 12-13).

On March 19, 2020, GFRB sent Worthy a proposal and quote for 6,426,240 bottles of hand sanitizer, which GFRB agreed to supply to Worthy by May 9, 2020. (*Id.* ¶ 14). Worthy's CEO and other representatives flew to Mexico on March 20, 2020 to inspect the Iron Labs factory that GFRB had selected to manufacture the hand sanitizers. (*Id.* ¶ 15). During the visit, Worthy received samples of hand sanitizers that were representative of those that GFRB would

supply to Worthy and were similar to those from GFRB's March 13, 2020 email. (*Id.*). The hand sanitizer samples contained 70% alcohol, were clear in color, and were packed in specific bottles that came with pumps and straws that reached the bottom of the bottles. (*Id.*).

Worthy emailed GFRB and Iron Labs a spreadsheet on March 21, 2020 detailing the parties' understanding of the production commitment for the hand sanitizers, based on the parties' meeting at the Iron Labs factory. (*Id.* ¶ 17). Subsequently, on March 23, 2020, GFRB sent a Confidential Supply Agreement ("CSA") to Worthy concerning the purchase of the hand sanitizers. (*Id.* ¶ 18). Worthy and GFRB continued the conduct business through purchase orders, phone calls, and emails, as is typical in the household essentials industry. (*Id.* ¶ 20). However, problems quickly arose with the hand sanitizers that Worthy received. (*Id.* ¶ 21). Unlike the samples and descriptions Worthy had relied on, the hand sanitizers Worthy received contained the wrong alcohol content, were cloudy rather than clear in appearance, had incorrect bottle shapes and sizes, and lacked pumps and straws that reached the bottom of the bottles. (*Id.* ¶¶ 21, 23-24). Worthy incurred expenses from re-labeling the bottles, ordering new pumps, losing sales from order cancellations, and issuing trade credits to dissatisfied customers. (*Id.* ¶¶ 21, 23, 25).

Worthy notified GFRB of the alcohol content issue on or around March 25, 2020 and the pumps issue in April 2020. (*Id.* ¶ 22). In April and May, 2020, Worthy again notified GFRB of complaints that Worthy had received from customers. (*Id.* ¶¶ 23-24). GFRB responded to the cloudy appearance of the hand sanitizers, saying "that's ridiculous … [that is] some of the worst stuff [they] have seen." (*Id.* ¶ 24). GFRB told Worthy "this will be fixed." (*Id.*). However, GFRB did not fix the issues and continued to request payment for the hand sanitizers that GFRB had yet to supply. (*Id.* ¶¶ 25-26). To date, Worthy has paid approximately $15 million to GFRB, but GFRB has supplied to Worthy only 6,881,796 out of the 41,411,600 bottles of hand sanitizer

GFRB had committed to supply. (*Id.* ¶¶ 27-28). Worthy has incurred approximately $3,890,642 in extra costs due to GFRB's failure to provide the hand sanitizers on time and with the expected characteristics. (*Id.* ¶ 28). GFRB has not compensated Worthy for these costs. (*Id.* ¶ 29).

Separately, in the summer of 2020, Worthy approached GFRB about purchasing disinfectant sprays to meet customer needs arising from the COVID-19 pandemic. (SAC ¶ 30). The U.S. Environmental Protection Agency ("EPA") regulates disinfectant sprays, and Worthy emphasized to GFRB that both the company that GFRB chose to manufacture the disinfectant sprays and the sprays themselves needed to have proper EPA registration. (*Id.* ¶ 31). On October 9, 2020 Worthy received and paid a $250,000 invoice from GFRB as a deposit for a 200,000 unit order of 9.8 oz. bag-on-value disinfectant sprays ("BOV sprays"). (*Id.* ¶ 32). Also, on October 14 and 26, 2020, Worthy paid two invoices from GFRB totaling $268,328.80 for five truckloads of 25 oz. trigger spray disinfectants ("trigger sprays"). (*Id.* ¶ 33).

GFRB then selected two factories in Mexico to manufacture the disinfectant sprays—Maquiladora Miniara S.A. de C.V. to manufacture the trigger sprays and Envatec S.A. de C.V. to manufacture the BOV sprays. (*Id.* ¶ 34). GFRB engaged Veronica Ortiz de Montellano as a consultant to assist with EPA registration for the disinfectant sprays. (*Id.* ¶ 35). De Montellano told Worthy that she would handle the EPA registration, label the disinfectant sprays with Worthy's label (The OhSo Co. Disinfectant Multi-Surface Spray), and include a valid EPA registration number on the labels so that Worthy could sell the sprays in the U.S. (*Id.* ¶ 36). On October 13, 2020, De Montellano instructed Worthy to use certain EPA registration numbers and described how the registration numbers should appear on labels for Worthy's disinfectant sprays. (*Id.* ¶ 37).

Stepan Company ("Stepan") holds a unique EPA registration number for the main active ingredient in the disinfectant sprays that Worthy purchased. (*Id.* ¶ 39). Stepan sub-registered the main active ingredient in the disinfectant sprays to CarrollClean, LLC ("CarrollClean"), which in turn received its own EPA sub-registration number that it could use to sell its products (*Id.*). GFRB and De Montellano advised Worthy to sub-register under CarollClean's EPA number and to use this same number to sell Worthy's disinfectant sprays in the U.S. (*Id.* ¶ 40). Worthy relied on GFRB's and De Montellano's advice, experience, and representations regarding the EPA registration process. (*Id.*).

Worthy received the five truckloads of trigger sprays it had ordered between October 23 and November 12, 2020. (*Id.* ¶ 38). On December 9, 2020, Worthy received and paid a $165,000 invoice from GFRB as a deposit for a second 200,000 unit order of BOV sprays. (*Id.* ¶ 41). The parties agreed to a December 15, 2020 delivery date for the BOV sprays, but GFRB failed to deliver the BOV sprays by that date. (*Id.* ¶¶ 41-42). On January 6, 2021, De Montellano informed Worthy that the EPA registration process for the BOV sprays was still underway, and suggested a workaround of relabeling the BOV sprays with CarrollClean's brand instead of Worthy's brand. (*Id.* ¶ 45). In mid-January 2021, U.S. Customs and Border Protection denied entry to the first of the five trucks carrying Worthy's BOV sprays from Mexico into the U.S. because the sprays lacked proper EPA registration. (*Id.* ¶ 47). As a result, the five trucks returned to the Envatec S.A. de C.V. factory in Mexico, and Worthy never received any of the BOV sprays it had paid for. (*Id.*). After U.S. Customs and Border Protection rejected the BOV sprays, Worthy became concerned about the EPA labeling of the trigger sprays that Worthy had received earlier. (*Id.* ¶ 48). Worthy discovered that the trigger sprays were improperly labeled as well, and

immediately recalled and issued refunds for the 96 bottles of trigger sprays it had sold. (*Id.* ¶ 49). All five truckloads of trigger sprays now remain quarantined in Worthy's facility. (*Id.*).

Worthy self-reported the EPA mislabeling incident to Stepan on February 24, 2021. (*Id.* ¶ 50). Despite Worthy's self-reporting, Stepan sent cease and desist letters on March 9, 2021 to both Worthy and GFRB. (*Id.* ¶¶ 51-52). On July 8, 2021, CarrollClean also sent a cease and desist letter to Worthy, stating that the products GFRB had sold to Worthy were counterfeits. (*Id.* ¶ 53). GFRB has not provided Worthy with an explanation of the improper use of Stepan's EPA registration number and of CarrollClean's sub-registration number. (*Id.* ¶ 55). The fraudulent EPA labeling resulted in over $1,542,397.20 in damages to Worthy—including lost profits— from the trigger sprays that Worthy quarantined and could not sell, from the BOV sprays that Worthy paid for but never received, and from the order cancellations and refunds that Worthy had to issue to customers. (*Id.* ¶ 56). GFRB demanded a full refund from GFRB for the trigger sprays and BOV sprays, but GFRB has refused to issue a refund to Worthy. (*Id.* ¶ 54).

GFRB commenced this action on July 29, 2021 and filed a complaint against Worthy, asserting claims for breach of contract and account. (Dkt. 51 ¶ 1). Worthy then filed the instant FAC against GFRB on November 18, 2021, asserting claims for breach of contract ("Count I") and breach of warranty ("Count II") related to the parties' agreement on hand sanitizers. (*Id.* ¶ 2; *see also* FAC). Under Count I, Worthy alleges that the parties had an enforceable contract consisting of the CSA, confirmatory memoranda, course of dealing, usage of trade, course of performance, and consistent additional terms like the March 13, 2020 photographs and the March 20, 2020 samples. (FAC ¶ 31). Worthy alleges that GFRB breached the contract because GFRB failed to deliver hand sanitizers that conformed to GFRB's representations and on a timely basis. (*Id.* ¶¶ 34-35). Under Count II, Worthy alleges that GFRB, through its

representations, expressly and implicitly warranted that the hand sanitizers would contain 70% alcohol, would be clear in color and packed in bottles of a specific shape, size, and material, would have pumps and straws that reached the bottom of the bottles, and would be shipped to Worthy in a timely manner. (*Id.* ¶¶ 40-41). Worthy alleges that GFRB breached these warranties because GFRB failed to supply hand sanitizers that conformed to these requirements. (*Id.* ¶ 42). GFRB provided hand sanitizers that contained 58% alcohol, were cloudy in appearance, lacked pumps, had straws that did not reach the bottom of the bottles, were packed in bottles of incorrect shape, size, and material, and were delivered to Worthy late, if at all. (*Id.*).

On December 9, 2021, GFRB moved to dismiss Worthy's FAC pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 51 ¶ 3). Subsequently, on March 23, 2022, GFRB and Worthy jointly stipulated that they wished to amend their pleadings to assert new counts against each other. (*Id.* ¶ 4). GFRB added a count for breach of contract, alleging that Worthy is in violation of a Non-Circumvention Agreement. (*Id.* ¶ 5). Worthy filed the instant SAC on June 6, 2022 and added a claim for breach of contract ("Count III") arising out of the parties' agreement on disinfectant sprays. (*Id.* ¶ 6; *see also* SAC). Under Count III, Worthy alleges that GFRB breached the parties' agreement by failing to provide the disinfectant sprays that Worthy had ordered and paid for and failing to supply the products on a timely basis. (SAC ¶ 76). Worthy further alleges that the products GFRB provided failed to conform to specifications, including EPA labeling, that were material to the parties' agreement and formed the basis of the bargain. (*Id.*). On June 21, 2022, GFRB moved to dismiss Worthy's SAC pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 55). However, the parties jointly stipulated that the filing of the SAC did not moot GFRB's pending motion to dismiss Worthy's FAC. (Dkt. 51 ¶ 11).

## LEGAL STANDARD

"To survive a motion to dismiss under 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.' " *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams*, 742 F.3d at 728 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[I]t is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief … by providing allegations that 'raise a right to relief above the speculative level.' " *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007) (citing *Twombly*, 550 U.S. at 555) (emphasis in original). The Court construes the complaint "in the light most favorable to the nonmoving party, accept[s] well-pleaded facts as true, and draw[s] all inferences in her favor." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

## DISCUSSION

I.     **Counts I and  II**

       a.  **Integration and the Parol Evidence Rule**

GFRB argues that the CSA, along with the Confidentiality and Non-Circumvention Agreement ("NDA") that the parties signed on March 18, 2020, is an integrated writing that constitutes the entire agreement on hand sanitizers between Worthy and GFRB. (Dkt. 33 at 2, 9). The CSA has a clause that disclaims all express and implied warranties associated with the hand

sanitizers. (*Id.* at 9). The parol evidence rule, GFRB argues, bars Worthy from introducing extrinsic evidence beyond the CSA and NDA to prove the existence of warranties. (*Id.* at 1). Accordingly, Worthy cannot state a claim for breach of warranties, and Worthy's FAC should be dismissed as a matter of law. (*Id.*). In response, Worthy contends that the Court should not apply the parol evidence rule at the motion to dismiss stage because integration is a question of fact, and the Court should accept Worthy's factual allegations as true at this stage of the litigation. (Dkt. 34 at 10-11). Furthermore, the CSA is not integrated—and the parol evidence rule should not bar extrinsic evidence of warranties—because the CSA lacks an integration clause and omits material terms such as the appearance and alcohol content of the hand sanitizers. (*Id.* at 12-13).

"The determination of whether a contract is integrated is a question of law for the trial judge to decide." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005); *see also Musson Bros., Inc. v. Cent. States*, 2014 WL 1356611, at *3 (N.D. Ill. Apr. 2, 2014) ("Whether an agreement is fully integrated is generally a question of law to be resolved by a court.") (citing *Merk v. Jewel Food Stores Div. of Jewel Companies, Inc.*, 945 F.2d 889, 893 (7th Cir. 1991)). In a motion to dismiss, the trial court should not engage in additional fact-finding to determine whether the parties intended the contract to be integrated, as such fact-finding "has no part in resolving a Rule 12(b)(6) motion." *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 729-30 (7th Cir. 1999); *see also In re Consol. Indus.*, 360 F.3d 712, 717 (7th Cir. 2004) ("[A] judge reviewing a motion to dismiss under Rule 12(b)(6) cannot engage in fact-finding."). However, if the contract evidences integration on its face and the plaintiff's complaint makes no factual allegations to counter the plain language of the contract, the issue of integration can be decided as a matter of law at the Rule 12(b)(6) stage. *Int'l Mktg., Ltd.*, 192 F.3d at 730.

A court may infer that "the contract imports on its face to be a complete expression of the whole agreement" if the contract is "neither intrinsically nor extrinsically ambiguous." *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785, 790-91 (7th Cir. 1995) (citing *Sunstream Jet Exp. v. Int'l Air Serv. Co.*, 734 F.2d 1258, 1265 (7th Cir. 1984)). "In Illinois, an unambiguous contract 'speaks for itself, and the intention with which it was executed must be determined from the language used.' " *Westchester Surplus Lines Ins. Co. v. Stonitsch Constr., Inc.*, 572 F. Supp. 2d 946, 952 (N.D. Ill. 2008) (quoting *Davis*, 396 F.3d at 878) (internal citations omitted). "[T]he failure to include an explicit integration clause by itself does not prevent a court from holding that the agreement is fully integrated." *Ardash Marderosian Tr. v. Quinn*, 2013 WL 5405705, at *4 (N.D. Ill. Sept. 25, 2013) (citing *Davis*, 396 F.3d at 878); *see also Westchester Surplus Lines Ins. Co.*, 572 F. Supp. 2d at 951 ("A contract need not contain an explicit integration clause to be fully integrated."). An integration clause does not need specific wording; "logically equivalent language—'[t]his policy contains all of the agreements between [certain parties]'—is an integration clause." *West Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 674 (7th Cir. 2015) (quoting *State Farm Mut. Auto. Ins. Co. v. Rodriguez*, 987 N.E.2d 896, 905 (Ill. App. Ct. 2013)). Nevertheless, "even when a contract is integrated on its face, if the contract is ambiguous, as a matter of law, then extrinsic and parol evidence is admissible to explain the terms of the ambiguous contract." *Davis*, 396 F.3d at 878 (internal citations omitted).

In this case, accepting the FAC's factual allegations as true and drawing inferences in favor of the non-movant Worthy, the CSA is not fully integrated on its face. "A written contract is fully integrated when it is intended by the parties to be a complete and exclusive statement of the agreement's terms; a contract is only partially integrated if it is intended as an incomplete expression (though a final expression on certain terms)." *West Bend Mut. Ins. Co.*, 794 F.3d at

10

673 (internal citations omitted). "When a contract is fully integrated, the parol-evidence rule bars evidence of prior or contemporaneous agreements within the scope of the written contract. If a contract is only partially integrated, the parol-evidence rule permits evidence of consistent additional terms." *Id.*

The CSA between Worthy and GFRB contains the volume and price per unit of the hand sanitizers, but the CSA omits other pertinent details such as alcohol content, appearance of the hand sanitizer liquid, bottle shape, and characteristics of the pumps and straws. (Dkt. 29-5 ¶ 2). [1] Given these omitted terms, the CSA cannot reasonably be seen as "a complete and exclusive statement of the agreement's terms." *West Bend Mut. Ins. Co.,* 794 F.3d at 673. The CSA is unlike the contract in *Baxter Healthcare Corp.*, which was "neither intrinsically nor extrinsically ambiguous" and was therefore integrated on its face. *Baxter Healthcare Corp.*, 69 F.3d at 791. Even if the CSA were partially integrated with respect to the terms contained in the CSA—the volume and price per unit of the hand sanitizers—the parol evidence rule would not bar extrinsic evidence of consistent additional terms, including GFRB's representations about the appearance and alcohol content of the hand sanitizers. *West Bend Mut. Ins. Co.,* 794 F.3d at 673. The CSA contains language that is logically equivalent to an integration clause—"The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement and the NDA." (Dkt. 29-5 ¶ 6). Despite this integration language, the CSA remains ambiguous or silent as to material attributes of the hand sanitizers that GFRB is supplying, so "extrinsic and parol

---

[1] The Court may consider the CSA in a 12(b)(6) motion without converting the motion into one for summary judgment, as the CSA is attached to and referenced by the FAC. *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice."). However, the NDA is not attached to the FAC and will not be considered.

evidence is admissible to explain the terms of the ambiguous contract." *Davis*, 396 F.3d at 878. As such, the Court denies GFRB's motion as to Counts I and II on this ground.[2]

### b. Disclaimer of Express Warranties

GFRB further argues that the express warranties in Count II should be dismissed because the CSA contains no express warranties and any express warranties are subject to the CSA's warranty disclaimer clause. (Dkt. 33 at 5, 7). By contrast, Worthy contends that GFRB made express warranties through the photographs and other representations that GFRB conveyed to Worthy and that subsequently formed the basis of the parties' agreement. (Dkt. 34 at 6-7).

"A contract can include express warranties in three ways." *Ellengee Mkt. Co. v. Phenix Specialty Films, LLC*, 556 F. Supp. 3d 874, 881 (N.D. Ill. 2021) (citing 810 ILCS 5/2-313(1)(a)-(c)). First, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Id.* Second, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." *Id.* Third, "[a]ny sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model." *Id.* at 882. However, "[a] post-sale promise is not part of the pre-sale basis of the bargain. *Id.* at 883-84.

In this case, the second method of creating express warranties is most applicable. GFRB made descriptions of the hand sanitizers to Worthy in the March 13, 2020 email, which contained photographs showing hand sanitizers that were clear in color, packed in specifically shaped and labeled bottles, and had pumps with straws that reached the bottom of the bottles.

---

[2] In addition, the Court declines to dismiss Count I because the arguments set forth in GFRB's briefing address only Count II.

(FAC ¶ 10). These photographic descriptions formed the basis of the parties' bargain, as Worthy relied on these descriptions in its decision to purchase hand sanitizers through GFRB. (*Id.* ¶ 12). The first method of creating express warranties is not as applicable here, as Worthy does not allege that GFRB expressly made any pre-sale oral or written affirmation of fact or promise about the hand sanitizers' appearance, alcohol content, bottle shape, or straw and pump features. (FAC). GFRB's only affirmation of fact or promise was its "this will be fixed" statement, made in response to customer complaints about the cloudy appearance of the hand sanitizers. (*Id.* ¶ 24). However, this statement did not create an express warranty because it was a "post-sale promise" and was not "part of the pre-sale basis of the bargain." *Ellengee Mkt. Co.*, 556 F. Supp. 3d at 883-84. The third method of creating express warranties is also not as applicable here because Worthy does not allege that GFRB directly gave the samples or instructed representatives of Iron Labs (a third party not present in the instant case) to give the samples to Worthy during Worthy's March 20, 2020 trip to the Iron Labs factory. (FAC ¶¶ 15-16).

To state a claim for breach of an express warranty under Illinois law, a complaint must allege six sets of facts. *Van Zeeland v. Rand McNally*, 532 F. Supp. 3d 557, 564 (N.D. Ill. 2021) (citing *Lambert v. Dollar Gen. Corp.*, 2017 WL 2619142, at *2 (N.D. Ill. June 16, 2017)). These sets of facts are: "(1) the terms of the warranty; (2) a breach or failure of the warranty; (3) a demand upon the defendant to perform …; (4) a failure by the defendant to do so; (5) compliance with the terms of the warranty by the plaintiff; and (6) damages." *Van Zeeland*, 532 F. Supp. 3d at 564-65. In this case, Worthy has alleged the necessary facts to state a claim for breach of express warranties. The FAC describes the terms of the warranty (the expected appearance of the hand sanitizers, etc.), GFRB's failure to supply conforming hand sanitizers, and Worthy's notification to and demand upon GFRB to supply conforming hand sanitizers. (FAC ¶¶ 10, 21-

24). Additionally, the FAC alleges that GFRB has not fixed the hand sanitizers, that Worthy has paid over $15 million to GFRB and is in compliance with its own contractual obligations, and that Worthy has sustained approximately $3,890,642 in damages due to GFRB's breach of the warranties. (*Id.* ¶¶ 25-28).

A party to a contract "may limit or exclude any express warranties so long as the 'words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other.' " *MAN Roland, Inc. v. Quantum Color Corp.*, 57 F. Supp. 2d 568, 572 (N.D. Ill. 1999) (quoting 810 ILCS 5/2-316); *see also Crane Carton Co. v. Indopco, Inc.*, 1992 WL 159288, at *2 (N.D. Ill. June 30, 1992) ("[N]egation or limitation [of an express warranty] is inoperative to the extent that such construction is unreasonable."). Here, the CSA contains the following disclaimer:

> DISCLAIMER OF WARRANTIES. COMPANY AND WORTHY HEREBY WAIVE ANY AND ALL EXPRESS AND IMPLIED WARRANTIES OF ANY KIND OF NATURE WHATSOEVER WITH RESPECT TO ALY [sic] AND ALL OF THE PRODUCTS SUBJECT TO THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(Dkt. 29-5 ¶ 5). The words here limiting or disclaiming express warranties cannot be reasonably construed as consistent with the conduct relevant to the creation of the express warranties. The express warranties on the attributes of the hand sanitizers arose through the second of the three methods of creating an express warranty—GFRB's "description of the goods which is made part of the basis of the bargain." *Ellengee Mkt. Co.*, 556 F. Supp. 3d at 881. Disclaiming express warranties that the hand sanitizers would conform to descriptions of the goods that formed the basis of the bargain would be unreasonable, as it would undermine the parties' very agreement. *See also A.B.C. Chevrolet Co. v. Kirk*, 1986 WL 10045, at *3 (N.D. Ill. Sept. 8, 1986) (holding that the defendant car seller's

14

assertion that the Chevrolet Monte Carlo's mileage was 37,485 miles—which created an express warranty—is inconsistent with a disclaimer of all warranties).

Therefore, the Court does not dismiss the express warranties in Count II on the basis that the CSA contained no express warranties and any express warranties were disclaimed by the CSA's warranty disclaimer clause.

### c. Disclaimer of Implied Warranties

GFRB also argues that the implied warranties in Count II should be dismissed because the CSA disclaimed any and all implied warranties of merchantability (fitness for ordinary purpose) and implied warranties of fitness for a particular purpose. (Dkt. 33 at 6).

Under Illinois law, "every sale of goods by a merchant includes an implied warranty that the goods are fit for the ordinary purposes for which they are used unless the warranty is modified or excluded. *Trans-Aire Int'l, Inc. v. Northern Adhesive Co., Inc.*, 882 F.2d 1254, 1257 (7th Cir. 1989) (citing 810 ILCS 5/2-314); *see also Horne v. Elec. Eel Mfg. Co., Inc.*, 987 F.3d 704, 724 (7th Cir. 2021) (noting that 810 ILCS 5/2-314 "provides for an implied warranty of merchantability for goods unless excluded or modified") (internal quotation marks omitted). Furthermore, "a sale of goods also includes an implied warranty of fitness for a particular purpose if a seller knows of the buyer's particular purpose for the goods and the buyer relies upon the seller's skill or judgment to select suitable goods." *Trans-Aire Int'l, Inc.* 882 F.2d at 1257.

A seller may " 'exclude or modify the implied warranty of merchantability or any part of it' by using language that 'must mention merchantability and in case of a writing must be conspicuous.' " *Accurate Transmissions, Inc. v. Sonnax Indus., Inc.*, 2007 WL 1773195, at *2 (N.D. Ill. June 14, 2007) (citing 810 ILCS 5/2-316(2)); *see also Horne*, 987 F.3d at 724

("[P]arties to a contract may bargain away rights to an implied warranty of merchantability."). "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous." *Accurate Transmissions, Inc.*, 2007 WL 1773195, at *3 (citing 810 ILCS 5/1-210(10)). Thus, the "test for conspicuousness in a business transaction is whether a reasonable business person is expected to notice the disclaimer." *Accurate Transmissions, Inc.*, 2007 WL 1773195, at *3 (internal citations omitted). Similarly, a seller may disclaim an implied warranty of fitness for a particular purpose by using conspicuous language of disclaimer. *Constr. Aggregates Corp. v. Hewitt-Robins, Inc.*, 404 F.2d 505, 510 (7th Cir. 1968); *see also Alpha Med., LLC v. Roche Diagnostics Corp.*, 2015 WL 5996349, at *4 (N.D. Ill. Oct. 14, 2015) (holding that a conspicuous disclaimer that mentioned implied warranties of merchantability and fitness for a particular purpose were enforceable under Indiana law).

In this case, CSA's warranty disclaimer validly disclaims all implied warranties of merchantability and fitness for a particular purpose. The warranty disclaimer is conspicuous, as it is written in all capital letters and a reasonable business person would be expected to notice the disclaimer. (Dkt. 29-5 ¶ 5). Additionally, the disclaimer explicitly mentions both the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. (*Id.*). Finally, Worthy does not allege the existence of an implied warranty of fitness, as the FAC does not state that Worthy needed the hand sanitizers for a specific purpose beyond their ordinary use of disinfecting surfaces and mitigating the spread of disease. (FAC).

Therefore, the Court dismisses the implied warranties in Count II on the basis that the implied warranties are disclaimed by the CSA. The express warranty claims in Count II survive.

## II.     Count III

Finally, GFRB argues that Count III in the SAC should be dismissed because Worthy fails to allege that GFRB had a contractual obligation to provide EPA-registered disinfectant sprays to Worthy. (Dkt. 54 at 5-6). Furthermore, GFRB contends that Worthy does not allege De Montellano was an agent or employee of GFRB and that it was De Montellano—not GFRB— who assured Worthy she would handle EPA registration of the disinfectant sprays. (*Id.*). In response, Worthy argues that GFRB knew the disinfectant sprays needed to be EPA-registered or else the products would not be sellable in the U.S, and that this understanding formed the basis of the parties' bargain. (Dkt. 59 at 7-8). GFRB expressly represented to Worthy that the products would be EPA-registered, including through GFRB's own invoices, which contained such phrases as "EPA BOV" and "EPA Spray." (*Id.*). Additionally, Worthy argues that the CSA does not cover the parties' agreement on disinfectant sprays—and even if it does, the CSA is not fully integrated, so the parol evidence rule does not bar extrinsic evidence of GFRB's obligation to supply EPA-registered sprays. (*Id.* at 11-13).

"A written contract is fully integrated when it is intended by the parties to be a complete and exclusive statement of the agreement's terms; a contract is only partially integrated if it is intended as an incomplete expression (though a final expression on certain terms)." *West Bend Mut. Ins. Co.*, 794 F.3d at 673 (internal citations omitted). In this case, the CSA is tailored to the parties' agreement on hand sanitizers and omits nearly all details on a possible agreement on spray disinfectants. (Dkt. 29-5). The CSA only makes a brief reference to the parties' agreement to "bring sanitization products, including hand sanitizers, to the United States" and includes an "Additional Products" clause that states, "Any new or additional products (e.g. wipes, etc.) purchased from the factory by Worthy will be priced Ex Works (EXW) factory in Mexico." (*Id.*).

Given that nearly all material terms relevant to the purchase of disinfectant sprays are missing or ambiguous, the CSA on its face cannot reasonably be construed as complete and exclusive statement of the agreement's terms. *Davis*, 396 F.3d at 878. Hence, the CSA is not fully integrated with respect to the parties' agreement on disinfectant sprays, and the parol evidence rule does not bar extrinsic evidence of GFRB's obligations to supply EPA-registered sprays. *Id.*

With respect to extrinsic evidence, Worthy alleges that the invoices it received from GFRB formed the basis of the parties' agreement and conveyed the understanding that GFRB would supply EPA-registered disinfectant sprays to Worthy. (Dkt. 59 at 7-8).[3] For example GFRB's October 9, 2020 invoice requested $250,000 for an "EPA BOV DEPOSIT." (Dkt. 54-6). GFRB's October 26, 2020 invoice requested $134,164 for a "FINAL PAYMENT 5 TRUCKS EPA SPRAY." (Dkt. 54-7). Additionally, GFRB's December 9, 2020 invoice requested $165,000 for a "OH SO STRONG EPA SPRAY ROUND 2 DEPOSIT." (Dkt. 54-9). "Undefined terms are generally given their 'plain, ordinary, and popular meaning' as found in dictionary definitions." *Dougherty v. City of Chi.*, 2020 WL 6508861, at *3 (N.D. Ill. Nov. 5, 2020) (quoting *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 453 (7th Cir. 2012) (applying Illinois law). "[T]he 'plain meaning' of the contract controls even though the parties themselves may have placed a different meaning on it." *Dougherty*, 2020 WL 6508861, at *3 (quoting *CSFM Corp. v. Elbert & McKee Co.*, 870 F. Supp. 841, 849 (N.D. Ill. 1994)). Here, the terms "EPA BOV" and "EPA spray" lack a standard dictionary definition and are ambiguous in that they are subject to more than one interpretation. See *Ardash Marderosian Trust*, 2013 WL 5405705, at *3 ("An ambiguity exists when the contractual provision contains language that is susceptible to more than one reasonable interpretation."). However, accepting the SAC's factual allegations as true

---

[3] The Court may consider GFRB's invoices in a 12(b)(6) motion without converting the motion into one for summary judgment, as these invoices are attached to and referenced by Worthy's SAC. *Geinosky*, 675 F.3d at 745 n.1.

and drawing inferences in favor of the non-movant Worthy, the plain meaning of "EPA BOV" and "EPA spray" is that the disinfectant sprays would be fully compliant with EPA requirements, including the EPA registration process, such that the sprays would be sellable in Worthy's intended market—the United States. Based on the facts in the SAC, there is insufficient support for GFRB's argument that the parties only agreed to GFRB supplying a product (disinfectant sprays that have EPA-compliant antimicrobial properties) and not a service (proper EPA registration of the products). (Dkt. 60 at 3).

GFRB contends that Worthy agreed to bear the risk of the disinfectant sprays that were denied entry into the U.S. because the CSA provides that "[a]ny new or additional products (e.g. wipes, etc.) purchased from the factory by Worthy will be priced Ex Works (EXW) factory in Mexico." (Dkt. 29-5 ¶ 4; Dkt. 56 at 7-8). GFRB notes that "ex works" means the "seller's delivery is complete (and the risk of loss passes to the buyer) when the goods are made available to the buyer at a location of the seller's choice." (Dkt. 56 at 7-8) (quoting Black's Law Dictionary (11th ed. 2019)). However, the ex works term in the CSA, even if it were to apply to disinfectant sprays, does not necessarily discharge GFRB's obligation to provide products that conform to the parties' agreement before the products are shipped from the factory in Mexico. See *Koursa, Inc. v. manroland, Inc.*, 971 F. Supp. 2d 765, 795-96 (N.D. Ill. 2013) (holding that a "prior to shipment ex works" term in a contract for the purchase of a printing press can reasonably be construed to require the printing press to be ready to ship in a complete state prior to the buyer making payment). Here, the ex works term in the CSA does not change that fact that the disinfectant sprays GFRB sourced were not even in a complete, ready-to-ship state when the sprays left the factory in Mexico. The sprays lacked a fundamental component—valid EPA

labels—necessary for the sprays to reach their destination in the U.S. Thus, the ex works factory term in the CSA does not provide a basis for dismissing Count III.

GFRB's argument that De Montellano, not GFRB, is responsible for mishandling the EPA registration process also fails as a basis for dismissing Count III. "On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations … with all reasonable inferences drawn in the non-moving party's favor." *Smoke Shop, LLC*, 761 F.3d at 785. Worthy expressly alleges that GFRB, along with De Montellano, was responsible for the EPA registration process. For example, "Jon Glick [of GFRB] engaged Veronica Ortiz de Montellano—an individual with a longstanding relationship with GFRB—as a consultant to assist with EPA registration for the disinfectant spray." (SAC ¶ 35). "As directed by GFRB, De Montellano ensured Worthy that she would handle the EPA registration of the spray disinfectant." (*Id.* ¶ 36). Additionally, "GFRB and De Montellano advised Worthy that Worthy could subregister under CarollClean's EPA number containing Stepan's active ingredient number and use this same number so that Worthy could sell the products in the United States." (*Id.* ¶ 40). Taking these factual allegations as true and drawing all reasonable inferences in Worthy's favor, GFRB—not just De Montellano—was responsible for the defective EPA registrations, and Count III is not dismissed for this reason.

Finally, GFRB points to the warranty disclaimer in the CSA to argue that GFRB was not obliged to supply EPA-registered disinfectant sprays. (Dkt. 56 at 9). This argument fails because even if the CSA applies to the parties' agreement on disinfectant sprays, Count III involves a breach of contract, not a breach of warranty. (SAC ¶ 76). "To state a breach of contract claim, a plaintiff must plead: '1) the existence of a valid and enforceable contract; 2) performance by the plaintiff; 3) breach of contract by the defendant; and 4) resultant injury to the plaintiff.' " *Stewart*

*v. A2B Cargo Inc.*, 2020 WL 5076716, at *4 (N.D. Ill. Aug. 26, 2020) (quoting *Henderson-Smith & Assocs. v. Nahamani Family Serv. Ctr.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001)). Worthy has satisfied each of these elements through the facts pleaded in the SAC. Worthy alleges that "GFRB and Worthy had a valid and enforceable contract for the supply of EPA registered spray disinfectant," "Worthy performed under the agreement by paying GFRB in full," "GFRB breached, and continues to breach, the parties' agreement," and "[a]s a direct and proximate result of GFRB's breaches, Worthy has incurred and continues to incur damages." (SAC ¶¶ 73, 75, 76, 79). The warranty disclaimer in the CSA does not directly address these elements of a breach of contract claim. Therefore, the Court does not dismiss Count III.

## CONCLUSION

For the foregoing reasons, GFRB's Motions to Dismiss are granted in part and denied in part. Worthy's implied warranties claim in Count II is dismissed. However, Worthy's express warranties claim in Count II and the entirety of Counts I and III survive. As the portion of the FAC related to Count II being dismissed suffers from legal deficiencies that cannot be cured, amendment of the claim would be futile. Therefore, the implied warranties claim of Count II is dismissed with prejudice.

Virginia M. Kendall
United States District Judge

Date: August 30, 2022