## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GFRB, LLC,
          Plaintiff/Counter-Defendant

    v.

WORTHY PROMOTIONAL
PRODUCTS, LLC,
          Defendant/Counter-Plaintiff

No. 21 CV 4051

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

Plaintiff GFRB, LLC ("GFRB"), an Illinois-based sourcing company, filed this lawsuit against Worthy Promotional Products, LLC ("Worthy"), an Alabama-based supplier of sanitation products, alleging that Worthy failed to pay for hand sanitizer that GFRB sourced from a factory in Mexico and breached a non-circumvention agreement by ordering products from another supplier without GFRB's consent. (*See* R. 52 ("FAC").)[1] Worthy responded with counterclaims alleging that GFRB breached its obligations by failing to provide EPA-registered disinfectant spray and violated warranties in the parties' supply agreement. (R. 54.) Now, the parties cross move for summary judgment. (R. 89; R. 90; R. 95.) For the reasons that follow, GFRB's motion for summary judgment is granted in part and denied in part, Worthy's motion for summary judgment is denied, and GFRB's motion for summary judgment on damages is granted in part and denied in part.

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## BACKGROUND[2]

GFRB is an Illinois-based company that sources products manufactured by international producers for suppliers in the United States. (Worthy's SOF ¶ 4.) Worthy, an Alabama-based supplier, provides household sanitation products to retailers for resale to consumers. (*Id.* ¶¶ 1–2.)

### I.    THE HAND SANITIZER SUPPLY AGREEMENT

In early 2020, GFRB and Worthy began to explore a business relationship pursuant to which GFRB would source hand sanitizer from manufacturers in Mexico to meet the growing demand caused by the COVID-19 pandemic. (*Id.* ¶ 8.) In March 2020, GFRB's co-manager, Jon Glick, telephoned Bo Worthy, one of Worthy's members, and asked if Worthy could supply hand sanitizer. (*Id.* ¶ 9.) Glick later told Bo that GFRB had a contact in Mexico that could produce sanitizer for Worthy. (GFRB's Resp. to Worthy's SOF ¶¶ 9–10.)

---

[2] The Court takes the factual background from the parties' Local Rule 56.1 submissions, (*see* GFRB's Statement of Undisputed Material Facts ("GFRB's SOF") (R. 93); GFRB's Statement of Undisputed Material Facts in Support of its Motion for Partial Summary Judgment on Damages ("GFRB's Damages SOF") (R. 94); Worthy's Statement of Uncontested Material Facts in Support of its Motion for Summary Judgment ("Worthy's SOF") (R. 97); GFRB's Response to Worthy's Statement of Material Facts ("GFRB's Resp. to Worthy's SOF") (R. 99); GFRB's Statement of Additional Material Facts ("GFRB's SOAF") (R. 100); Worthy's Response to GFRB's Statement of Undisputed Material Facts ("Worthy's Resp. to GFRB's SOF") (R. 104 at 1–25); Worthy's Statement of Additional Material Facts ("Worthy's SOAF") (R. 104 at 25–37); Worthy's Response to GFRB's Statement of Undisputed Material Facts on Damages ("Worthy's Resp. to GFRB's Damages SOF") (R. 105 at 1–23 ); Worthy's Statement of Additional Material Facts Regarding Damages ("Worthy's Damages SOAF") (R. 105 at 23–33); Worthy's Response to GFRB's Statement of Additional Material Facts ("Worthy's Resp. to GFRB's SOAF") (R. 113); GFRB's Response to Worthy's Statement of Additional Material Facts ("GFRB's Resp. to Worthy's SOAF") (R. 114); GFRB's Response to Worthy's Statement of Additional Material Facts Regarding Damages ("GFRB's Resp. to Worthy's Damages SOAF") (R. 117)), the accompanying exhibits, and all other aspects of the record in this case. Facts are genuinely undisputed unless otherwise noted.

On March 23, 2020, GFRB and Worthy executed an agreement pursuant to which GFRB agreed to "bring sanitization products, including hand sanitizer, to the United States." (R. 1-2 (the "Supply Agreement"); GFRB's Resp. to Worthy's SOF ¶ 21.) Worthy agreed to purchase hand sanitizer through GFRB from a factory in Mexico at the following prices based on the volume of hand sanitizer units purchased:

| **Size** | **Price Per Unit (USD)** |
|---|---|
| 60 ML | $0.90 |
| 125 ML | $1.25 |
| 500 ML | $2.05 |
| 1 L | $3.16 |

(GFRB's Resp. to Worthy's SOF ¶ 21; Supply Agreement § 2(a).)

The Supply Agreement contained the following payment terms: "Ninety percent (90%) upon receipt of the invoice, subject to factory terms. The balance (ten percent (10%)) shall be due within twenty-four hours of receipt of the corresponding shipment." (*Id.* § 2(d).) Finally, it provided that "all orders for product" would be placed through GFRB and would "comply with the factory's terms and conditions, including their payment terms." (*Id.* § 3.)

GFRB identified a factory in Mexico called Iron Labs to manufacture hand sanitizer for Worthy. (GFRB's SOAF ¶ 2.) Worthy agreed to purchase 6,646,240 units of hand sanitizer for a purchase price of $10,059,264, plus a sourcing commission for GFRB, resulting in a total purchase price of $13,145,606.40. (Worthy's Resp. to GFRB's SOAF ¶¶ 3, 13–15.) The order would be fulfilled in separate shipments. (*See*

3

*generally id.*) The same day that this order was finalized, GFRB submitted an invoice to Worthy indicating that $9,806,045.76 was due "on receipt of invoice." (*Id.* ¶ 16.) Worthy did not pay this amount up front, however, and made multiple payments as the shipments of hand sanitizer were delivered over the following weeks. (*Id.* ¶ 17.)

Iron Labs' commercial director, Daniel Tegeiro, testified that Worthy's failure to pay the invoice "on receipt," as required by the Supply Agreement, created a "domino effect" that prevented Iron Labs from delivering the hand sanitizer according to its target delivery dates. (R. 100-4 at 73:15–75:14.) As a result, the parties fell behind on the agreed supply schedule. (*See id.*) Worthy also requested changes to the quantities of each unit of hand sanitizer to be manufactured and shipped, and these deviations were never formally documented with change orders. (Worthy's Resp. to GFRB's SOAF ¶ 19.) On April 30, GFRB and Worthy sent Iron Labs a letter referencing a "shortage of production" and indicating that Iron Labs still needed to ship 5,272,000 units of hand sanitizer pursuant to the first order by May 13. (R. 100-1 ¶ 20; R. 100-10.) The letter sets forth an alternative payment structure proposing an "upfront deposit of 30%" on the next series of shipments. (R. 100-1 ¶ 20; R. 100-10.)

Consistent with this payment structure, Worthy wired GFRB $3 million in May 2020, which GFRB remitted to Iron Labs (allegedly pursuant to Worthy's instructions). (R. 100-1 ¶¶ 21–22; Worthy's Resp. to GFRB's SOAF ¶ 22.) Tegeiro testified that Iron Labs treated this $ 3 million as an advance on a second order and

used the money to purchase materials to fulfill it, including labels, boxes, and pumps. (R. 100-4 at 59:11-59:25; 62:8-65:15.)

On June 23, 2020, GFRB sent Worthy an invoice for the outstanding balance of $1,895,606.40 for its commission on the first order of hand sanitizer. (*See* R. 100-23.) Worthy sent GFRB $250,000.00 on July 15, stating that it was "payment on your [GFRB] first allotment iron lab invoice." (Worthy's Resp. to GFRB's SOAF ¶ 35; R. 100-21.) GFRB responded: "THANK YOU for the partial payment on the GFRB INVOICE!" (R. 100-21.) Worthy did not make further payments on the $1,645,606.40 that remained outstanding. (Worthy's Resp. to GFRB's SOAF ¶¶ 36–37.)

On June 30, Iron Labs' owner and principal, Jose Chedraui Jastrow ("Pepe"), emailed Jon Glick and told him that Iron Labs needed additional funds to complete the second order. (R. 100-16; R. 94-23 at 189:2–4.) On July 2, 2020, Teigeiro sent Worthy's Vice President of Sales and Marketing, Matt Worthy, an email offering to "close the first order" with "money substituting for liter." (R. 100-9.) Teigeiro testified that he understood this to mean that the first order would be complete when Iron Labs supplied $10,059,264 worth of hand sanitizer to Worthy instead of the exact number of specific unit sizes of hand sanitizers enumerated in the initial purchase order. (R. 100-4 at 51:3–56:24.) Matt Worthy responded to Teigeiro's email, "Thanks, Daniel!" (R. 100-9.)

That same day, Bo Worthy emailed Jon Glick and wrote that "Effective today, 7/3/20, and going forward, Worthy will no longer operate under an allotment agreement with Iron Labs," and that "for the 3 million that has been forwarded and

prepaid for what was to be the second allotment," Iron Labs needed to either "return the money" or Worthy would "initiate a purchase order system for specific trucks each week until the $3 million is used up." (Worthy's Resp. to GFRB's SOF ¶ 27; R. 100-15.)

Following the apparent breakdown of its relationship with Iron Labs, Worthy attempted to "work down" the $3 million by wiring additional funds through GFRB to Iron Labs and receiving hand sanitizer and other products from Iron Labs at discounted prices. (R. 96 at 4.) On three separate occasions, Worthy ordered hand sanitizer at discounted rates. (Worthy's Resp. to GFRB's SOAF ¶¶ 31–33.) However, Worthy never fully recouped its $3 million deposit. (*See id.*) All told, Worthy paid $15,500,000.00 under the Supply Agreement, but only received $14,965,197.00 of hand sanitizer, leaving a shortfall of $534,803.00. (Worthy's SOF ¶ 27.) In a September 28, 2020 text message, Bo Worthy wrote to Pepe of Iron Labs that "you currently have millions of dollars of Worthy money that has been paid on deposit" and asked Iron Labs "when can you return it?" (GFRB SOAF ¶ 34.) On July 15, 2021, Bo wrote in an internal email that "Iron Labs still owes us 2 mill." (*Id.* ¶ 39.)

Meanwhile, Worthy never fully paid GFRB for the invoice it sent in June 23. GFRB presented three subsequent invoices for the amount still outstanding on the first allotment in September 2020, December 2020 and June 2021. (Worthy's Resp. to GFRB's SOAF ¶ 36.) Worthy never objected to these invoices. (*Id.*) After Worthy refused payment, GFRB filed its claim against Worthy for breach of contract.

## II.    THE DISINFECTANT SPRAY AGREEMENT

In the summer of 2020, while GFRB was sourcing hand sanitizer from Iron Labs, Worthy tapped GFRB to help import disinfectant spray from Mexico for sale.

6

(Worthy's Resp. to GFRB's SOF ¶ 37.) Worthy wanted the disinfectant spray to bear its "OhSo Co." brand named and, because the product would be sold in the United States, understood that that it would need to be registered with the Environmental Protection Agency ("EPA"). (*Id.* ¶¶ 38–39.) GFRB identified factories in Mexico that could manufacture the requested disinfectant spray. (*Id.* ¶¶ 41–42, 51.)

To obtain EPA registration, Worthy initially engaged a consultant named Tasha Lott. (*Id.* ¶ 49.) In September 2020, however, Worthy and GFRB began communicating with another individual named Veronica Ortiz De Montellano, an EPA consultant employed by a company named Sialico. (*Id.*) Although De Montellano had helped GFRB identify one of the Mexican factories as a source for disinfectant spray (*id.* ¶ 52), the precise nature of her relationship with the parties is vigorously disputed. She has not been deposed, and the parties represent that she resides in Mexico. (R. 91 at 15.) GFRB claims that De Montellano was hired directly by Worthy, whereas Worthy claims she was working as an agent for GFRB. (*Id.* ¶¶ 61, 62, 68.)

In any event, Worthy came to rely on De Montellano to accomplish the EPA registration process for the disinfectant spray. (*Id.* ¶ 54.) She advised Worthy on how to structure the label for its disinfectants, what information to include, and what EPA registration number to use. (*Id.*) GFRB paid De Montellano a consulting fee for the hand sanitizer that she helped source, and she was listed as GFRB's "agent" on a request for a company registration that GFRB submitted to the EPA. (GFRB's Resp. to Worthy's SOAF ¶ 36; R. 106 at 121.) There is no evidence that Worthy paid De Montellano for her services. (GFRB's Resp. to Worthy's SOAF ¶ 37.)

While the parties were working on EPA registration for the spray, GFRB sent Worthy three invoices titled "EPA BOV Deposit," "Final Payment 5 Trucks EPA Spray," and "EPA Spray Round 2 Deposit." (*Id.* ¶¶ 24–25.) Worthy's corporate representative, Alexandra Worthy, testified that Worthy paid these invoices in reliance on GFRB's representation that the product would be EPA-registered. (R. 106 at 2–43 ("Alexandra Worthy Dep.") at 67:9–21.)

In mid-January, U.S. Customs and Boder Protection denied entry to the first truck carrying disinfectant spray. (Worthy's Resp. to GFRB's SOF ¶ 64.) Worthy received a notice from the EPA indicating that the registration number on the label for the spray "does not belong" to Worthy and that the spray would therefore be considered "an unregistered pesticide." (*Id.* ¶ 65; *see also* R. 93-26 at 3.) De Montellano proposed relabeling the spray, but Worthy refused to do so. (Worthy's Resp. to GFRB's SOF ¶ 66.) GFRB issued Worthy a partial refund of its commission. (GFRB's Resp. to Worthy's SOAF ¶ 41.)

On June 22, 2021, Worthy's counsel sent De Montellano's employer, Sialico, a letter indicating that Worthy had "relied exclusively on Sialico, through Ms. Veronica Ortiz De Montellano, to secure proper EPA registrations for these disinfectant products" and that Worthy "suffered significant monetary damages due to what certainly appears to be Sialico's negligence." (Worthy's Resp. to GFRB's SOF ¶ 69; *see also* R. 93-39 at 4.) Worthy subsequently filed a counterclaim against GFRB, alleging that the sourcing company contracted to provide EPA-registered disinfectant spray, but failed to do so.

### III.    THE NON-CIRCUMVENTION AGREEMENT

On March 18, 2020—several days prior to executing the Supply Agreement—GFRB and Worthy entered into a Confidentiality and Non-Circumvention Agreement (the "Non-Circumvention Agreement") pursuant to which GFRB, as the "Disclosing Party," agreed to "make introductions" to certain "people or entities associated with the manufacturing or selling" of sanitization products, referred to collectively as the "Disclosing Parties Contacts." (R. 93-1 ("NCA") § 7.) In exchange, Worthy agreed not to "contact, deal with, negotiate or participate in any transactions with any of the Disclosing Parties Contacts" without first entering into a written agreement with GFRB or obtaining GFRB's prior written consent. (*Id.*) The Non-Circumvention Agreement does not contain any geographic restrictions and provides that the obligations in § 7 will survive for a period of five years following the agreement's termination date. (*Id.* § 4.)

On May 8, 2020, around the same time that the parties were negotiating the Supply Agreement, GFRB shared with Worthy a catalogue of products manufactured by a Mexican company called "Reyma." (Worthy's Resp. to GFRB's SOF ¶ 6.) The catalogue contained prices for various products, as well as Reyma's contact information. (*See* R. 93-6.) At the time that Worthy received the catalogue, no one at Worthy knew of or had previously interacted with Reyma. (Alexandra Worthy Dep. at 27:15-22; 28:6-10; 157:18-22; *see also id.* at 156:2–157:22.) After reviewing the catalogue, Worthy ordered paper plates through GFRB that were manufactured by Reyma. (Worthy's Resp. to GFRB's SOF ¶ 8.) Worthy paid a commission on these plates. (*Id.* ¶ 9.) Later that summer, GFRB shared a spreadsheet with Worthy titled

9

"Reyma.xlsx" that contained product and pricing information for various products that Reyma manufactured. (*Id.* ¶ 10.)

Almost one year later, Worthy was presented with the opportunity to source products for a prospective customer. (*Id.* ¶ 12.) One of Worthy's employees, Edel Lombera, contacted Reyma directly and inquired if Reyma could supply the products. (*Id.* ¶ 14; Worthy SOAF ¶¶ 14–18.) Beginning in December 2021, Worthy began to order foam lunch trays and other products manufactured by Reyma from a company called 4J's Distribution Company ("4J's"). (*Id.* ¶ 17.) Between December 6, 2021 and March 1, 2022, Worthy purchased $1,061,287.24 of product manufactured by Reyma through 4J's. (*Id.* ¶ 18; R. 93-12 at 9.) Worthy became aware that the foam lunch trays it had ordered through 4J's were manufactured by Reyma at least as early as January 4, 2022. (R. 106 at 45–47 ("Bo Worthy Supp. Decl.") ¶ 23.) However, Worthy did not notify GFRB, nor did it seek GFRB's consent prior to placing additional orders. (Worthy's Resp. to GFRB's SOF ¶ 32.)

Upon learning that Worthy was sourcing products from Reyma, GFRB sent Worthy a cease-and-desist letter, claiming that Worthy's actions violated the Non-Circumvention Agreement. (*Id.* ¶ 35; *see also* R. 93-18.) Worthy continued to order Reyma-manufactured products even after receiving this letter. (Worthy's Resp. to GFRB's SOF ¶ 36.) GFRB eventually filed suit against Worthy, alleging that its actions breached the Non-Circumvention Agreement. (*See* R. 1.)

## IV.   PROCEDURAL BACKGROUND

GFRB filed a two-count complaint against Worthy, alleging breach of contract for Worthy's failure to pay amounts outstanding under the Supply Agreement and,

in the alternative, account stated. (*See generally id.*) It later amended the complaint to include a claim for breach of the Non-Circumvention Agreement. (*See* FAC.) Worthy answered the complaint and filed counterclaims for breach of the Supply Agreement, breach of express and implied warranty, and breach of contract due to GFRB's failure to provide EPA-registered disinfectant spray. (R. 54.) GFRB moved to dismiss Worthy's counterclaims. (R. 55). The Court granted the motion as to Worthy's implied warranty counterclaim but denied the motion as to all other counts. (R. 64.)

The parties now cross-move for summary judgment. GFRB moves affirmatively on its claim for breach of the Non-Circumvention Agreement, and moves on Worthy's counterclaim regarding disinfectant spray, as well as Worthy's damages theories. (R. 89; R. 90.) Worthy moves for summary judgment on each of GFRB's claims. (R. 95.) The Court now addresses the merits of these motions.

## LEGAL STANDARD

"Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, all facts and inferences must be drawn "in the light most favorable to the nonmoving party on each motion." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015) (quoting *Wis. Alumni Rsch. Found. v. Xenon Pharm., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010)). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In evaluating motions for summary judgment, the Court does not

"weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

## ANALYSIS

### I.   GFRB's Claims

The Court begins by addressing GFRB's claims against Worthy for breach of the Supply Agreement, account stated, and breach of the Non-Circumvention Agreement. Worthy moves for summary judgment on each of these claims, and GFRB cross-moves for summary judgment on its claim for breach of the Non-Circumvention Agreement.

### A.   Breach of the Supply Agreement (Count I)

The Court begins with GFRB's claim for breach of the Supply Agreement. To prove breach of contract under Illinois law, a plaintiff must show: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (citation omitted). Because the Supply Agreement is a contract for the sale of goods, and because neither party objects, the Court applies the Uniform Commercial Code ("UCC"), 810 ILCS 5/2-102, *et seq.*, in analyzing its terms.

Worthy argues that it is entitled to summary judgment because GFRB has not presented sufficient evidence that Worthy breached the contract or that GFRB performed all of the required conditions. (*See generally* R. 96.)

12

Under Illinois law, the first step in resolving a contract dispute is determining whether "the written contract was integrated—that is, if it was intended to be the final and completed expression of the parties' agreement." *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co.*, 794 F.3d 666, 673 (7th Cir. 2015). If an agreement is fully integrated, then "parol evidence," or extra-contractual evidence reflecting the parties' intentions, may not be considered. *See id.* Determining integration is a question of law. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005). Under the UCC, courts look to a variety of factors, including merger or integration clauses, disclaimer clauses, prior negotiations, any alleged extrinsic terms, and the sophistication of the parties. *Hessler v. Crystal Lake Chrysler-Plymouth*, 788 N.E.2d 405, 413 (Ill. App. Ct. 2003) (citing *Betaco, Inc. v. Cessna Aircraft Co.,* 32 F.3d 1126, 1132–33 (7th Cir. 1994)).

This Court previously held, in connection with GFRB's motion to dismiss, that the Supply Agreement was not fully integrated, and that parol evidence could be considered to determine the scope and terms of the parties' agreement. *See GFRB, LLC v. Worthy Promotional Prod., LLC*, 624 F. Supp. 3d 959, 966–67 (N.D. Ill. 2022). The presentation of evidence has not altered this conclusion. Although the parties agreed on the initial pricing for units of hand sanitizer in the Supply Agreement, the document does not speak to certain other key terms, such as when the hand sanitizer needed to be delivered to the United States, whether GFRB was obligated to remit the payments it received to Iron Labs, and what consequences would follow if Worthy

13

failed to provide 90% payment upon receipt of the invoice. *Davis*, 396 F.3d at 878. It is therefore appropriate to consider extrinsic evidence.

"Whether a contract exists, its terms, and the intent of the parties are questions of fact for the trier of fact." *Mulliken v. Lewis*, 615 N.E.2d 25, 27 (Ill. App. Ct. 1993). Considering the parties' communications, course of dealing, and other evidence in the light most favorable to GFRB, there is, at minimum, a genuine dispute of material fact as to whether Worthy breached the Supply Agreement. Worthy describes the Supply Agreement as a straightforward agreement between itself—as the buyer—and GFRB as the seller. Under the UCC, "the obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." 810 ILCS 5/2-301. Worthy contends that it paid $15,500,000 for hand sanitizer, but received product that was worth only, at most, $14,965,197. (R. 112 at 6.) According to Worthy, "simple subtraction" shows that it overpaid by approximately $500,000.00. (*Id.*)

GFRB argues that this description is overly simplistic. As an initial matter, GFRB disputes Worthy's contention that it was a "seller" of hand sanitizer under the UCC. Jon Glick testified that, as a sourcing company, GFRB "functioned as an extension of Worthy," never took title to the hand sanitizer, and remitted funds to Iron Labs at Worthy's direction. (R. 99-1 ¶¶ 10–12). Iron Labs' commercial director, Tegeiro, corroborated Glick's testimony, stating that he directly invoiced Worthy for purchases of hand sanitizer, that Worthy was Iron Labs' customer, and that he

understood GFRB to be acting as Worthy's commercial representative. (R. 100-4 at 16:6–17:23.)

"Under the Uniform Commercial Code . . . it is well established that a sale occurs only where there is a passing of title to a buyer." *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 523 (7th Cir. 2003). Thus, for a party to be a "seller" it must pass title to a buyer for a price. *Scott v. Glob. Vasion, Inc.*, No. 20 C 1287, 2021 WL 3159875, at *2 (S.D. Ill. Apr. 29, 2021) (citing 810 ILCS 5/2-103(1)(d); 801 5/2-106(1)). Worthy does not substantively respond to GFRB's argument that it was not a "seller" under the UCC. (Worthy's Resp. to GFRB SOAF ¶ 9.)

Moreover, even if GFRB qualifies as a "seller" under the UCC, there are also material disputes regarding the agreed payment structure and the proper allocation of payments made after Worthy's receipt of the first invoice. GFRB contends that the parties negotiated and priced the hand sanitizer transactions as two separate "allotments." According to GFRB, the first allotment was covered by the March 23, 2023, invoice and the second allotment was separately negotiated in late April and early May of 2020.[3] If, as GFRB contends, the first allotment is considered on its own, then Worthy only paid $11,500,000.00 of the $13,145,606.40 that it owed. Because GFRB remitted $10,059,264.00 of this amount to Iron Labs, GFRB is left with a shortfall of $1,645,606.40, for which GFRB billed Worthy and Worthy failed to pay. (GFRB SOAF ¶ 37.) By contrast, if, as Worthy suggests, the transactions are treated

---

[3] The March 23, 2020, invoice, which GFRB attached in support of its motion for summary judgment, supports the notion that there were two separate allotments, since the amount of hand sanitizer that appears on the invoice—6,426,240 units—is less than the aggregate amount (6,881,796 units) that Worthy purchased.

as an integrated whole, then it follows that Worthy overpaid for the hand sanitizer that it received. (Worthy's Resp. to GFRB's SOF ¶¶ 3, 7.) The Supply Agreement is silent on which interpretation is correct, and a reasonable jury could reach different conclusions based on the parties' extrinsic communications and conduct.

Finally, there is the question of who breached the Supply Agreement first. Generally, "a party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party." *Daniggelis v. Pivan*, 513 N.E.2d 92, 96(Ill. App. Ct. 1987) (quotation marks omitted). This is because "a material breach of a contract provision will justify nonperformance by the other party[.]" *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579–80 (7th Cir. 2019) (citing *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1025 (Ill. App. Ct. 2012)). This doctrine applies only to "material" breaches, however, and "the determination of 'materiality' is a complicated question of fact," *Sahadi v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 706 F.2d 193, 196 (7th Cir. 1983), that depends on "the inherent justice of the matter." *Arnhold v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) (quoting *Kel–Keef Enters. Inc. v. Quality Components Corp.*, 738 N.E.2d 524, 537 (Ill. App. Ct. 2000)).

The Supply Agreement required Worthy to pay 90% of the invoice amount for the first allotment when the invoice was received. (Supply Agreement § 2(d).) Teigerio, Iron Labs' commercial director, stated that this term was included "[b]ecause [Iron Labs] did not have the resources to comply with an order" of the volume specified in the March 23, 2020 invoice" absent payment in advance. (R. 100-

16

4 at 23:22–25:3.) Worthy admits that it received an invoice for the first allotment and failed to pay 90% of the invoice up front. (Worthy's Resp. to GFRB's SOAF ¶¶ 16–17.) A reasonable jury could conclude that Worthy breached the Supply Agreement first, and that this failure was a material breach that excused a subsequent failure to perform. Because of these factual disputes, Worthy's motion for summary judgment on GFRB's breach of contract claim is denied.

### B.    Account Stated (Count II)

The Court next turns to GFRB's claim for an account stated. Worthy moves to dismiss this claim because Illinois does not recognize an account stated as independent cause of action. (R. 96 at 9–10.)

"An account stated is an agreement between parties who previously engaged in transactions that the account representing those transactions is true and the balance stated is correct, together with a promise for the payment of the balance." *Dreyer Med. Clinic, S.C. v. Corral*, 591 N.E.2d 111, 114 (Ill. App. Ct. 1992). The agreement is often formed by one party submitting a statement of account to another, who retains the account beyond a reasonable time without objection. *Brad Foot Gear Works, Inc. v. Delta Brands, Inc.*, 332 F. Supp. 2d 1123, 1125 (N.D. Ill. 2004) (citing *W.E. Erickson Const., Inc. v. Congress-Kenilworth Corp.*, 477 N.E.2d 513, 519 (Ill. App. Ct. 1985)).

Worthy correctly notes that an account stated is not an independent cause of action under Illinois law. *Medix Staffing Sols., Inc. v. Novo Health, LLC*, No. 22 C 225, 2024 WL 579995, at *5 (N.D. Ill. Feb. 13, 2024) (citations omitted). Instead, it is "merely a form of proving damages for the breach of a promise to pay on a contract."

17

*House of Brides, Inc. v. Alfred Angelo, Inc.*, 163 F. Supp. 3d 534, 544 (N.D. Ill. 2016) (quoting *Dreyer*, 591 N.E.2d at 114).

This is beside the point, however. Even though an account stated is a theory of damages rather than a standalone claim, it does not follow that Worthy is entitled to summary judgment simply because it was pled as such. A plaintiff may allege an account stated claim in the alternative to a breach of contract claim—as GFRB did here. *RehabCare Grp., E., Inc. v. Camelot Terrace, Inc.*, No. 11 C 6557, 2012 WL 1246560, at *6 (N.D. Ill. Apr. 13, 2012) (citing *Pedersen & Houpt, P.C. v. Summit Real Estate Grp., LLC,* 877 N.E.2d 4 (Ill. App. Ct. 2007)) (holding that an account stated may be alleged in the alternative to the breach of contract claim). And GFRB has also presented *prima facie* evidence of an account stated. GFRB sent invoices to Worthy on at least three separate occasions indicating the amount that Worthy owed to GFRB in connection with the first allotment of hand sanitizer. Worthy did not object to any of the invoices. This is sufficient evidence of an account stated. *See Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1137–38 (7th Cir. 2009). Accordingly, Worthy's motion for summary judgment as to this theory of damages is denied.

## C. Breach of the Non-Circumvention Agreement (Count III)

The Court next turns to GFRB's claim for breach of the Non-Circumvention Agreement. Both parties move for summary judgment on this claim. (*See* R. 91 at 10–13; R. 96 at 10–18.) GFRB argues that Worthy violated the agreement by purchasing products from Reyma without obtaining GFRB's consent. Worthy argues in response

18

that the Non-Circumvention Agreement is unenforceable, and, even if the agreement is enforceable, its actions did not violate it.

### 1. Enforceability

The Court begins with the question of enforceability. "[W]hether a restrictive covenant is enforceable or not is a question of law." *Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000). Illinois courts distinguish between restrictive covenants that arise in the context of an employer-employee relationship and those that are formed as part of an arms'-length transaction between two businesses, such as those that are incident to a going-concern sale. *U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1103-05 (N.D. Ill. 2012) (discussing standards).

Restrictive covenants in the employment context are permitted only if they (1) are no more restrictive than is required for the protection of a legitimate business interest of the employer; (2) do not impose undue hardship on the employee, and (3) are not injurious to the public. *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). By contrast, restrictive covenants ancillary to the sale of a business are subject to a more lenient standard: they are permitted if they are "reasonable as to time, geographical area and scope of prohibited business activity." *Aquila Inv. Grp., LLC v. Hiller*, No. 16 C 2351, 2019 WL 13227324, at \*12 (C.D. Ill. May 31, 2019) (quoting *Cent. Water Works Supply, Inc. v. Fisher*, 608 N.E.2d 618, 621–22 (Ill. App. Ct. 1993)). Illinois courts are "quite willing" to enforce covenants between "intelligent" businesspeople and "entrepreneurs" who have "the benefit of legal counsel." *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 634 (7th Cir. 2005).

19

As an initial matter, the Court finds that the Non-Circumvention Agreement should be evaluated under the standard governing business-to-business covenants, like sales, as opposed to the standard governing employer-employee relationships. *See Aquila*, 2019 WL 13227324, at *18 (applying the business-to-business test in analyzing the enforceability of a non-circumvention agreement). Both GFRB and Worthy are "sophisticated corporations dealing with each other at arms-length." *RealSource*, 910 F. Supp. 2d at 1103-05; *see also Owens Trophies, Inc. v. Bluestone Designs & Creations, Inc.*, 12 C 7670, 2014 WL 126082, at *1-3 (N.D. Ill. Jan. 14, 2014). Worthy was represented by counsel, and it did not lack bargaining power in transacting with GFRB.[4] Finally, the benefit that Worthy gained by entering the Non-Circumvention Agreement was not a salary, but "the opportunity to create new business" by sourcing products through GFRB. *Hess Newmark Owens Wolf*, 415 F.3d at 634.

Having determined that the business-to-business standard applies, the Court next addresses whether the scope of the Non-Circumvention Agreement is reasonable. The Court begins with the time period of the restraint. The Non-Circumvention Agreement applies for five years following termination. (NCA § 4.) Illinois courts have upheld activity restraints designed to protect the solicitation of business for a period of five years, *see Arpac Corp. v. Murray*, 589 N.E.2d 640, 649 (Ill. App. Ct. 1992), and have even allowed restrictions of comparable duration in the

---

[4] Worthy claims that its counsel did not review the Non-Circumvention Agreement (*see* Worthy's Resp. to GFRB's SOF ¶ 4) but does not dispute the fact that it was represented by counsel at the time that the agreement was executed or that it had an opportunity to review its terms.

employer-employee context. *Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 100 (Ill. 2006); *Health Pros., Ltd. v. Johnson*, 791 N.E.2d 1179, 1193 (Ill. App. Ct. 2003) (collecting cases).

Worthy, for its part, fails to identify a case in which a relationship of comparable length between businesspeople represented by counsel was invalidated. It cites *Pampered Chef v. Alexanian* for the proposition that the duration of a restrictive covenant must be reasonably related to the needs of the business. 804 F. Supp. 2d 765, 790 (N.D. Ill. 2011). In *Pampered Chef*, the court refused to grant a preliminary injunction to an employer who was seeking to enforce a non-solicitation agreement against former employees where the employer failed to offer any evidence besides its "feeling" to justify a two-year temporal limitation. *Id.* at 794. Worthy points to the fact that Jon Glick was unable to identify any specific features of the GFRB-Worthy business relationship that justified a five-year limitation during his deposition, and that Glick admitted the limitation had been adopted from a template. (Worthy's SOF ¶ 14.)

The fact that *Pampered Chef* involved a covenant between an employee and a former employer renders it distinguishable. *See U.S. Data Corp.*, 910 F. Supp. 2d at 1104–05 (holding that non-circumvention agreement was enforceable where the defendant "cited no authority that the protections afforded former employees should also be extended to sophisticated corporations dealing with each other at arms-length."). At any rate, GFRB offered more than its feelings to justify the five-year limitation. Jon Glick testified that the template agreement was chosen in part

because "Mr. Worthy had emphasized that he needed to move very quickly;" and that
the five-year limitation had been used in previous agreements between GFRB and
other retailers and was therefore suitable to the needs of the parties. (R. 106 at 55,
59:22-60:7; 59, 79:21-80:20.) Worthy does not dispute that it had an opportunity to
review the agreement and did not object to the five-year limitation. Under the facts
as presented, and in the absence of authority to the contrary, the Court concludes
that five-year expiration date is permissible.

The next factor to be considered is geographic scope. This factor is assessed
"less rigorously" in the business-to-business context. *Aquila*, 2019 WL 13227324, at
*16. Worthy describes the Non-Circumvention Agreement as geographically
unlimited, since it would prohibit business dealings with any of GFRB's contacts—
regardless of their location. (R. 96 at 7, 14–16.) It cites *Unilog Content Solutions, LLC
v. Thanx Media, Incorporated*, in which the district court refused to enforce a
restrictive covenant that prohibited a counterparty "from ever creating any product
in any market in the world that competes with a Unilog product." 2016 WL 7212477,
at *3 (N.D. Ill. Dec. 13, 2016).

Worthy's analogy to *Unilog* is misplaced. Whereas the restriction in that case
foreclosed competition, the restriction in this case is limited to protecting GFRB's
relationships with its suppliers. Illinois law recognizes the validity of restrictive
covenants that protect business relationships, even if they lack a geographic
limitation. For example, "a territorial limitation is not required in activity covenants
designed not to prevent competition but to protect the employer's relationships with

22

its customers." *Health Pros., Ltd. v. Johnson*, 791 N.E.2d 1179, 1192 (Ill. App. Ct. 2003) (quoting *PCx Corp. v. Ross,* 522 N.E.2d 1333, 1340 (Ill. App. Ct. 1988)). Like these covenants, the Non-Circumvention Agreement "does not impose a [geographic] restraint on [Worthy's] activities; it simply prohibits [Worthy] from doing business with" GFRB's suppliers. *Id.* Because the purpose of the restraint is "not to prohibit competition but to protect [GFRB's] relationships," the restraint is not void under Illinois law simply because it lacks a geographic limitation. *McRand, Inc. v. van Beelen*, 486 N.E.2d 1306, 1315 (Ill. App. Ct. 1985).

That leaves whether the restriction is reasonable as to the "scope of prohibited business activity." *Aquila*, 2019 WL 13227324, at *12. Here, too, the nature of GFRB's sourcing business weighs in favor of enforceability. GFRB's owner, Jon Glick, testified that "[a] sourcing company only has the value of the contacts" it possesses and, that to "protect a long-term relationship and the contacts for that sourcing company and potential revenue, you always would protect the source of that product." (R. 106 at 60, 83:2-84:4.)

Illinois law recognizes that the relationships that a company forms as part of its business constitute the company's goodwill. *See, e.g.*, *In re Est. of McCubbin*, 465 N.E.2d 672, 674 (Ill. App. Ct. 1984) ("The good will of a business is primarily characterized by the personal relationships and customer contacts which the owner of the business has been able to develop."). And the protection of a business' goodwill is an appropriate basis for imposing restraints on competition under Illinois law. *See Cent. Water Works*, 608 N.E.2d at 622. Parties engaging in a business venture have

23

an interest in "secur[ing] the loyalty of [their] co-venturers," "demonstrating their loyalty and commitment to the company and each other," and "ensur[ing] that they would not do anything to hinder the success of the company." *Id.*; *see also U.S. Data Corp.*, 910 F. Supp. 2d at 1105 (holding that a corporation has a "legitimate business interest in preventing [the other party] from interfering with its relationship with clients.").

When viewed in light of GFRB's business objectives, the Non-Circumvention Agreement is not unreasonable in terms of the scope of prohibited activity. Worthy cites *Lifetec, Inc. v. Edwards*, for the proposition that GFRB lacks a protectable interest in its relationship with Reyma because Reyma's catalog is publicly available online. 880 N.E.2d 188, 196 (2007). But *Liftec* dealt with an employer-employee covenant. *See id.* Worthy cites no case law foreclosing the protection of client relationships in the business-to-business setting. At any rate, the Non-Circumvention Agreement does not prevent Worthy from accessing publicly available information or doing business with GFRB's contacts (absent a prior introduction), nor does it prohibit Worthy from developing its own supplier contacts independently of GFRB.

In sum, because the Non-Circumvention Agreement was negotiated by sophisticated parties who were represented by counsel; because its temporal limitations and absence of geographic limitations do not render the agreement invalid under Illinois law; and because GFRB has presented evidence that the provision was necessary to protect the value of its sourcing business; the Court concludes that the Non-Circumvention Agreement is enforceable under Illinois law.

### 2. Breach

Having concluded that the Non-Circumvention Clause is enforceable, the Court next considers whether Worthy breached the contract by purchasing products from Reyma. Under Illinois law, "if a contract is clear and unambiguous, the court must determine the intent of the parties solely from the plain language of the contract." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 792 (7th Cir. 2014) (quoting *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 782 (Ill. App. Ct. 1999)). The Non-Circumvention Agreement permitted GFRB, as the "Disclosing Party," to "make introductions" to certain "people or entities associated with the manufacturing or selling" of the products it would be sourcing (defined as the "Disclosing Parties Contacts"). (GFRB's SOF ¶ 3; NCA § 7.) In exchange, Worthy promised not to "contact, deal with, negotiate or participate in any transactions with any of the Disclosing Parties Contacts" without GFRB's prior agreement or consent. (GFRB's SOF ¶ 3; NCA § 7.) The agreement provides that GFRB is entitled to damages "in the event of circumvention . . . directly or indirectly." (NCA § 7.)

Viewing the evidence in the light most favorable to Worthy, there is no genuine dispute that it breached the Non-Circumvention Agreement. For starters, Reyma qualified as one of the "Disclosing Parties Contacts" under the Non-Circumvention Agreement. On May 8, 2020, GFRB shared a catalogue that included Reyma's contact information and provided pricing information for various Reyma products. (GFRB's SOF ¶ 6; R. 93-6.) Prior to receiving this catalogue, Worthy had never ordered any products either directly or indirectly from Reyma. (Worthy's Resp. to GFRB's SOF ¶

25

7.) In fact, at the time that the catalogue was sent, no one at Worthy had even heard of Reyma. (*Id*.)

Worthy implies that Reyma was not a Disclosing Parties Contact because GFRB never introduced Worthy to Reyma personnel and Reyma's existence was a matter of public knowledge. But the language of the Non-Circumvention Agreement is broader than Worthy implies; "Disclosing Parties' Contacts" include those whose names and identities Worthy "may learn from" GFRB and who are "introduced *or revealed*." (NCA § 7 (emphasis added).) Worthy does not dispute that GFRB revealed the existence of its sourcing relationship with Reyma when it sent Worthy the catalogue. And while Worthy *could* have discovered Worthy's existence through publicly available information prior to receiving the catalogue, there is no evidence that it did so. *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

Only one Worthy employee, Edel Lombera, testified that he "knew of the existence of Reyma" before May 2020. (R. 106 at 49, ¶ 4.) Even if Lombera's knowledge could be imputed to Worthy, he did not start working at Worthy until May 27, 2020, almost three weeks after GFRB sent Worthy the Reyma catalogue. (R. 93-5 at 36, 156:2–157:22.) Because GFRB's introduction predated Lombera's employment at the company, Lombera's testimony is insufficient to create a genuine factual dispute.

Taking a slightly different tack, Worthy argues that interpreting the Non-Circumvention Agreement in this manner would prevent Worthy from accessing

26

publicly available information and would therefore be contrary to public policy. (R. 91 at 16.) As stated above, however, the Non-Circumvention Agreement does not prevent Worthy from accessing public information, rather it imposes written consent as a condition of doing business with one of GFRB's contacts *only after* GFRB has made an introduction or supplied information revealing the existence of a relationship. (*See* NCA § 7.) Worthy was aware of the potential peril of doing business with Reyma; its corporate representative testified that, following GFRB's introduction, Worthy had "concerns about doing business directly with Reyma" due to "Reyma's previous relationship with GFRB." (GFRB's SOF ¶ 16.) In sum, Reyma was a "Disclosing Parties' Contact" under the Non-Circumvention Agreement and Worthy needed to obtain GFRB's written consent prior to transacting with them.

Worthy next argues that it is not responsible for breaching the Non-Circumvention Agreement because it did not purchase Reyma's products directly; but from 4J's, a third-party company. (GFRB's SOAF ¶ 12.) This argument, too, is contrary to the plain language of the Non-Circumvention Agreement. Notably, the agreement prohibits Worthy from circumventing the section "directly *or indirectly*" and applies to Worthy's "associates, joint ventures, partnerships, divisions, subsidiaries, parent company, employees, agents, heirs, assigns, designees, [and] consultants" as well as to the company itself. (NCA § 7 (emphasis added)); *see also Cheli v. Taylorville Cmnty. Sch. Dist.*, 986 F.3d 1035, 1041 (7th Cir. 2021) (courts must "ascribe[] meaning to every clause, phrase and word used; which requires nothing to be rejected as meaningless, or surplusage."). Construing the Non-

Circumvention Agreement in the manner Worthy proposes would require reading the word "indirectly" out of the agreement. It would also be contrary to the parties' intent, as it would permit Worthy to do indirectly what it was forbidden from doing directly. *See Holmes v. Godinez*, 991 F.3d 775, 783 (7th Cir. 2021) ("Illinois law requires that contracts must be construed to avoid . . . results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek.") (quotation omitted).

Finally, Worthy suggests that interpreting the Non-Circumvention Agreement in this manner would hold Worthy responsible for "unintended and unknowing purchases." (R. 103 at 6.) This argument is rebutted by undisputed evidence showing that approximately 80% of the products that Worthy ordered from 4J's were placed after January 4, 2022, when Worthy became aware that the products were manufactured by Reyma. (*See* R. 93-12 at 5–7.) Holding Worthy liable for purchases that it made from 4J's would not be inequitable under the circumstances.

Accordingly, GFRB's motion for summary judgment on its claim for breach of the Non-Circumvention Agreement is granted and Worthy's motion for summary judgment on this claim is denied.

## V.    WORTHY'S COUNTERCLAIMS

The Court next considers Worthy's counterclaims. Worthy asserts counterclaims for breach of warranty related to the supply of hand sanitizer (Counts I and II) and breach of contract related to GFRB's failure to provide EPA-registered

disinfectant spray (Count III). GFRB moves for partial summary judgment on Counts I and II on the issue of damages and moves on the merits of Count III.

### A. Counts I and II (Damages Only)

The Court begins with GFRB's partial motion for summary judgment on damages. "The party claiming damage bears the burden of proving those damages to a reasonable degree of certainty." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632 (7th Cir. 2007). GFRB argues that Worthy supplied insufficient evidence of lost profits and refunds; that damages based on nonconforming or damaged goods are inconsistent with the terms of the Supply Agreement; and that Worthy failed to mitigate its damages. The Court addresses each argument in detail, beginning with Worthy's damages claims for lost profits.

### 3. Lost Profits

Section 2-715(2) of the UCC allows a buyer of goods to recover consequential damages from a seller's breach, including lost profits. *Altana, Inc. v. Abbott Lab'ys*, No. 04 C 4807, 2006 WL 2505822, at *3 (N.D. Ill. Aug. 29, 2006), *aff'd sub nom. Nycomed US Inc. v. Abbott Lab'ys,* 542 F.3d 1129 (7th Cir. 2008) (citing *Burrus v. Itek Corp.,* 360 N.E.2d 1168, 1173 (Ill. App. Ct. 1977)). Lost profits may be recovered when (1) the defendant's wrongful acts caused the loss, (2) the profits were reasonably contemplated at the time of contracting, and (3) the lost profits can be proved with reasonable—not absolute—certainty. *TAS Distrib. Co.*, 491 F.3d at 632 (citing *Milex Prods., Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1235 (Ill. App. Ct. 1992)); *see also Arcor, Inc. v. Textron, Inc.*, 960 F.2d 710, 714 (7th Cir. 1992) (citing *Malatesta v.*

*Leichter,* 542 N.E.2d 768, 783 (Ill. App. Ct. 1989)) ("Under Illinois law, lost profits need not be proven with "absolute certainty," but only to a 'reasonable certainty.'").

### a.    All Sports Marketing

GFRB argues that Worthy cannot demonstrate lost profits of $1,269,720 arising from the cancellation of an order placed by a customer called All Sports Marketing ("ASM"). (R. 91 at 2–5.) The Court agrees. The only evidence submitted by Worthy to support this damages claim is a counterproposal sent by Bo Worthy to ASM on March 21, 2020, prior to the execution of the Supply Agreement. (GFRB's Damages SOF ¶ 7.) Bo Worthy requested a 50% deposit as a condition of submitting a purchase order. (*Id.* ¶ 11.) There is no evidence that ASM accepted this counterproposal. ASM's corporate representative was deposed and testified that ASM declined to respond because "I would have never given him that kind of money as a deposit ever," and Mr. Worthy was "asking for money asap and I don't do business that way," adding that "[w]hen someone is telling me I need an answer asap, you're going to get a no out of me 99.9 percent of the time." (94-7 at 60:11–62:4.)

To be entitled to lost profits, a buyer must show that the seller's wrongful actions caused the alleged loss. *TAS Distrib. Co.*, 491 F.3d at 632. Worthy has presented no evidence that GFRB's alleged failure to supply hand sanitizer—as opposed to its own requirement of 50% money down and ASM's refusal to comply with this condition—caused the ASM purchase order not to materialize. The evidence shows that the potential ASM deal fell apart even before the Supply Agreement was executed, for reasons unrelated to GFRB's conduct. It follows that Worthy has failed

to meet its burden of establishing causation. Accordingly, GFRB's motion for summary judgment as to Worthy's theory of lost-profit damages is granted.

### b. Accelerate360

Worthy also seeks lost profits arising from a purchase order allegedly placed by a company called Accelerate360. (R. 91 at 2–7.) Accelerate360 ordered 1,056,000 two-ounce bottles of hand sanitizer and 2,028,000 sixteen-ounce bottles of hand sanitizer from Worthy on June 30, 2020. (Worthy's Damages SOAF ¶ 9.) Worthy alleges that, due to GFRB's failure to supply hand sanitizer pursuant to the parties' shipping schedule, Worthy was unable to provide Accelerate360 with the number of two-ounce bottles that it contracted for. As a result, Worthy filled the remainder of the order using sixteen-ounce bottles.

GFRB argues that Worthy has failed to establish its lost profits with reasonable certainty. It seizes upon the fact that Worthy received the same amount of money from Accelerate360 for the sixteen-ounce bottles as it would have for the two-ounce bottles. (*See* Alexandra Worthy Dep. at 30:22–31:15.) Because Worthy received an identical amount of money, GFRB argues, Worthy has failed to establish lost profits.

This argument ignores evidence that Worthy's profit margin on the two-ounce bottles was greater than the margin on the sixteen-ounce bottles. Bo Worthy testified that the two-ounce bottles were priced at only $0.88 per unit and would have earned Worthy a gross profit of $453,000.00 when sold, as opposed to the sixteen-ounce bottles, which were priced at $1.48 per unit and yielded a gross profit of only $384,338.24. (Bo Worthy Supp. Decl. ¶ 12.) Because Worthy supplied evidence that it

31

earned a lower profit margin on the sale of hand sanitizer due to GFRB's alleged breach of the Supply Agreement, it has met its *prima facie* burden. *Arcor*, 960 F.2d at 714. GFRB's motion for summary judgment as to this category of damages is therefore denied.

### c.     Hand Sanitizer Inventory

GFRB next argues that Worthy cannot recover lost profits of $1,397,057 for hand sanitizer that Worthy purchased and kept in inventory. (R. 90 at 7–12.) Here too, the evidence, viewed in the light most favorable to Worthy, is sufficient to support an award of lost profits.

In the context of an "established business" with recurring costs, lost profits can be determined with reasonable certainty based on past experience. *Tri-G, Inc. v. Burke, Bosselman & Weaver,* 856 N.E.2d 389, 408 (Ill. 2006) (citing *Milex*, 603 N.E.2d at 1237). Alexandra Worthy testified that GFRB's failure to deliver hand sanitizer in sufficient quantities in March 2020 led to Worthy missing out on potential sales due to decreasing demand in the summer of 2020. (Alexandra Worthy Dep. at 67:20-68:6.) She also identified a customer with whom Worthy had a preexisting relationship— Jardine & Associates—that purchased approximately $ 9.3 million of hand sanitizer from Worthy in 2020. (*Id.* at 84:14-16; R. 107 at 11–16 ¶ 15.) According to Worthy, Jardine & Associates would have bought additional hand sanitizer during the relevant period if GFRB had not breached the Supply Agreement.

The facts are similar to *Arcor, Inc. v. Textron, Inc.*, in which the Seventh Circuit held that the issue of lost profits was appropriately submitted to a jury where the plaintiff's corporate representative testified that there were "a number of jobs" that

the plaintiff "would have received from its pre-existing customers" but for the defendant's breach. 960 F.2d at 714. There, as here, only the sufficiency of the evidence (not its admissibility) was at issue. *See id.*[5]

Because Alexandra Worthy's testimony is sufficient to establish entitlement to lost profits on its unsold inventory, the Court does not address GFRB's argument that Bo Worthy's supplemental affidavit should be stricken, or that lost profit calculations based on customers other than Jardine & Associates are untimely. GFRB may renew these arguments in pretrial briefing. However, because the evidence is sufficient to create a question of fact as to lost profits based on unsold inventory, GFRB's motion for summary judgment on this issue is denied.

### 4.    Damages for Nonconforming/Detained Shipments

GFRB next argues that damages related to the destruction or detainment of hand sanitizer while in transit from Iron Labs' factory in Mexico are barred by the plain language of the Supply Agreement. (R. 92 at 12.) Worthy claims (i) $127,411.20 of damages for two truckloads of hand sanitizer that were allegedly damaged by water; and (ii) $63,705.60 of damages for hand sanitizer that was transported on a

---

[5] Although GFRB argues in its reply brief that Alexandra Worthy's Rule 30(b)(6) testimony concerning its communications with Worthy's customers is hearsay, it did not raise this argument in its initial brief and has therefore waived it for the purposes of summary judgment. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) (quoting *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998)) ("Arguments raised for the first time in a reply brief are waived").

truck allegedly held by the Food and Drug Administration ("FDA") and never received. (GFRB Damages SOF ¶¶ 47–48.)

The Supply Agreement provides that delivery of hand sanitizer is "Ex Works (EXW) factory in Mexico." (Supply Agreement § 2.) "Ex works" is a trade term which means that the "seller's delivery is complete (and the risk of loss passes to the buyer) when the goods are made available to the buyer at a location of the seller's choice without requiring a collecting vehicle to be loaded, as at the seller's showroom, factory, or warehouse." (R. 92 at 12 (citing Black's Law Dictionary (11th ed. 2019)); *see also Koursa, Inc. v. Manroland, Inc.*, 971 F. Supp. 2d 765, 795–96 (N.D. Ill. 2013). The contract indicates—and the parties do not dispute—that the location in question is Iron Labs' factory in Mexico. *See Claudia v. Olivieri Footwear Ltd.*, No. 96 C 8052, 1998 WL 164824, at *1 (S.D.N.Y. Apr. 7, 1998) ("'Ex works' or 'ex factory' means that the seller's delivery obligation is merely to deliver the goods to the buyer at the seller's factory").

The Supply Agreement also disclaims all express and implied warranties. It provides, in capitalized font:

> COMPANY AND WORTHY HEREBY WAIVE ANY AND ALL EXPRESS AND IMPLIED WARRANTIES OF ANY KIND OF NATURE WHATSOEVER WITH RESPECT TO ALY (*sic*) AND ALL OF THE PRODUCTS SUBJECT TO THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE

(Supply Agreement § 5.) GFRB argues that, under the plain language of the supply agreement, GFRB cannot be liable for goods that were confiscated by the FDA, either

34

because Worthy accepted the risk of nonconforming shipments pursuant to the "ex works" provision or because Worthy disclaimed all warranties.

GFRB is entitled to summary judgment on both damages claims. First, GFRB is entitled to summary judgment on Worthy's $127,411.20 damages claim regarding two truckloads of hand sanitizer that were allegedly damaged by water. These damages are squarely foreclosed by the "ex works" provision of the Supply Agreement. Worthy does not challenge GFRB's definition of "ex works" or the notion that, under the provision, risk of loss passes to the buyer after goods depart from the factory. (*See* R. 92 at 17.) Instead, it asserts that the "ex works" provision is supplanted by a March 18, 2020, email in which Jon Glick informed Worthy that Worthy would be responsible for freight charges but that "we would change title in Laredo." (R. 107 at 1 ¶ 23.) Worthy claims that this email shows that GFRB agreed to bear the risk of damage to shipments up until the transfer of title in Laredo.

Even if Glick's message that the parties would "change title in Laredo" could be read in the manner that Worthy suggests, it would contradict the Supply Agreement, which states that the goods will be "priced Ex Works (EXW) *factory in Mexico*." (Supply Agreement § 2 (emphasis added).) Under the UCC, although extrinsic evidence may be used "to explain, supplement, or add to the agreement" it "cannot contradict a contract's express terms." *LifeWorks Tech. Grp. LLC v. Walgreen Co.*, 295 F. Supp. 3d 884, 890–91 (N.D. Ill. 2018). If the written agreement and the parol evidence conflict, "the UCC mandates that the express agreement trumps" the extrinsic evidence. *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir. 1997). In

short, the March 18 email cannot overcome the plain language of the Supply Agreement. Because it is undisputed that the "ex works" provision bars claims based on losses that occurred after the goods were shipped, the Court concludes that Worthy's claim for damages based on water-damaged shipments cannot proceed.

The same is true of Worthy's damages claim for goods that were seized by the FDA. Pursuant to the "ex works" provision, Worthy accepted the risk that government regulators would seize the goods after they left the Mexican factory. Moreover, even if these damages were not barred by the "ex works" provision, they would be barred by the disclaimer of warranties provision. As previously held, the Supply Agreement validly disclaimed all implied warranties. *See GFRB, LLC*, 624 F.Supp.3d at 969–70. And although the Supply Agreement did not disclaim express warranties, Worthy has identified no "affirmation of fact or promise," "description of the goods," or "sample or model" warranting that the hand sanitizer would be FDA-compliant. *Ellengee Mkt. Co. v. Phenix Specialty Films, LLC*, 556 F. Supp. 3d 874, 882 (N.D. Ill. 2021) (quoting 810 ILCS 5/2-313(1)(a)). Accordingly, GFRB's motion for summary judgment on this issue is granted as well.

### 5. Damages for Customer Refunds

Next, GFRB seeks summary judgment on damages based on refunds that Worthy issued to customers on account of GFRB's alleged breach. Worthy disclosed the following six refunds as damages:

| Date | Customer | Amount |
|-----------|---------------------|-----------|
| 4/24/2020 | Star Asset Security | $140.16 |
| 5/15/2020 | Jardine Associates | $2,012.40 |

| 5/27/2020 | Chemstar Corporation | $4,204.80 |
| 2/12/2021 | Metal & Wood Design Company | $15,000 |
| 2/12/2021 | Online Bahama Bo's (Leon Addison, Jr.) | $19.99 |
| 2/12/2021 | Online Bahama Bo's (Leon Addison, Jr.) | $13.99 |

(R. 105 ¶ 50.)

Viewing the evidence in the light most favorable to Worthy, the Court concludes that there is no genuine basis for four of the six claimed refunds. First, there is no documentation to support Worthy's claim that it issued a refund to Star Asset Security. (Worthy's Resp. to GFRB's SOF ¶ 51.) Worthy also admitted that it issued a refund to Chemstar because its own delivery was "2 pallets short," and not because of any alleged fault on the part of GFRB. (*Id*. ¶ 52.) Finally, the refund to Leon Addison, Jr. was issued because Mr. Addison complained the sanitizer he received was "not the fragrance we were looking for," and there is no evidence that GFRB ever made any representations concerning the fragrance of the hand sanitizer. (*Id*. ¶ 56.) Indeed, Worthy concedes that each of these claims have no evidentiary basis. (R. 102 at 16 n.11) Accordingly, GFRB's motion for summary judgment as to these refunds is granted.

That leaves the refunds issued to Metal & Wood Design Company and Jardine Associates for hand sanitizer that was "damaged" and mislabeled. GFRB argues that these refunds are also barred by the Supply Agreement's "ex works" provision. (R. 92 at 14.) However, the record is silent as to whether the damage and mislabeling before or after the goods left Iron Labs' factory. If the goods were damaged prior to leaving

37

Iron Labs' factory, the "ex works" provision does not apply. Because this is a question of fact, the Court denies summary judgment.

### 6. Failure to Mitigate Damages

Finally, GFRB argues that Worthy failed to mitigate $552,474.45 of costs incurred due to nonconforming shipments of hand sanitizer. (R. 92 at 14–16.) "As a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts." *Orawin Tech., LLC v. Healthcare Delivered, LLC*, 16 C 19, 2018 WL 5013566, at *3 (N.D. Ill. Oct. 16, 2018). Whether a proponent of a contract claim has mitigated its damages is a question of fact on which the opponent bears the burden of proof. *AES Tech. Sys., Inc. v. Coherent Radiation*, 583 F.2d 933, 942 (7th Cir. 1978); *Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 688 (7th Cir. 1985).

GFRB presents evidence that Iron Labs offered to either replace nonconforming shipments of hand sanitizer or refund the amounts that Worthy paid. For example, when two trucks arrived containing hand sanitizer that allegedly did not contain 70% alcohol, GFRB informed Worthy that Iron Labs offered to "pay for all that." (GFRB's Damages SOF ¶ 61.) When Worthy complained about the cloudy appearance of the hand sanitizer in another shipment, Iron Labs' principal, Pepe, stated that "if you require we replace them without problem, we are business partners and respond 100% always." (R. 94-30). Finally, when Worthy complained to Iron Labs regarding issues with straws on some of the bottles, GFRB told Worthy that "he is open to paying all his issues." (R. 94-31 at 2.)

Although there is no evidence that Worthy ever took up Iron Labs on these offers, summary judgment is premature. Under Illinois law, "the duty to mitigate

may not be invoked by one who has breached a contract as grounds for a hypercritical examination of the injured party's conduct, or as evidence that the injured party might have taken steps which seemed wiser or would have been more advantageous to the breaching party." *Exelon Bus. Servs. Co., LLC v. Pelco Structural, LLC*, No. 16 C 611, 2020 WL 7027565, at *12 (N.D. Ill. Nov. 30, 2020) (quoting *Pioneer Bank & Tr. Co. v. Seiko Sporting Goods, U.S.A. Co.*, 540 N.E.2d 808, 813 (Ill. App. Ct. 1989)). As Worthy points out, there was reason to doubt that Iron Labs would make good on its offers to replace or reimburse defective products, based on its failure to honor the terms of the delivery schedules. What's more, the statements that GFRB identifies appeared in text messages, and there is no evidence that Iron Labs followed up with formal offers of repayment. A reasonable jury could conclude that these texts did not represent genuine offers to pay for or replace defective products. GFRB's motion for summary judgment on this issue is therefore denied.

### B. Breach of Disinfectant Spray Contract (Count III)

Finally, the Court addresses GFRB's motion for summary judgment on Worthy's counterclaim for breach of contract regarding EPA-registered disinfectant spray. Worthy alleges that GFRB breached its contractual obligations because it "failed [to] deliver EPA registered spray disinfectant as agreed." (R. 54 ¶ 74.)

GFRB first argues that this counterclaim fails because GFRB only agreed to supply a product (the disinfectant spray) and not a service (EPA certification). "Under Illinois law, the proponent of a contract bears the burden of establishing a contract's existence." *Berkshire Invs., LLC v. S-Pro, LLC*, No. 22 C 5407, 2023 WL 5165663, at *3 (N.D. Ill. Apr. 13, 2023) (citing *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 795 (7th

Cir. 1999)). Once the proponent makes a *prima facie* showing, the burden shifts to the opponent to demonstrate the contrary. *Id.*

This path has been walked before. GFRB raised similar arguments in its motion to dismiss. (*See* R. 21.) In denying the motion, the Court noted that GFRB had sent Worthy several invoices listed "EPA spray" and "EPA BOV." *GFRB, LLC v. Worthy Promotional Prod., LLC*, 624 F. Supp. 3d 959, 971 (N.D. Ill. 2022). The Court concluded that "the plain meaning of 'EPA BOV' and 'EPA spray' is that the disinfectant sprays would be fully compliant with EPA requirements, including the EPA registration process, such that the sprays would be sellable in Worthy's intended market—the United States." *Id.* In other words, the invoices suggest that GFRB promised that it would provide EPA-registered disinfectant spray to Worthy.[6]

The Court sees no reason to revisit this conclusion. The evidence shows that Worthy contacted GFRB and informed Jon Glick that it wanted to purchase EPA registered disinfectant spray. (Worthy Damages SOAF ¶ 23 (citing Alexandra Worthy Dep. at 159:15–22, 161:9–12, 161:20–22, 162:3–6).) In response to these discussions, GFRB sent Worthy several invoices requesting payment for, and describing the product as, "EPA BOV Deposit," "Final Payment 5 Trucks EPA Spray," and "EPA Spray Round 2 Deposit." (*Id.* ¶¶ 24–25.) The invoices, together with the testimony of

---

[6] The Court also concluded that Worthy's claim for breach of contract based on GFRB's failure to obtain EPA registration for the disinfectant spray was not barred by the "ex works" provision or the disclaimer of warranties provision. *GFRB, LLC*, 624 F. Supp. 3d at 971. "The ex works term in the CSA, even if it were to apply to disinfectant sprays, does not necessarily discharge GFRB's obligation to provide products that conform to the parties' agreement before the products are shipped from the factory in Mexico." *Id.* And the disclaimer provision only applied to breach of warranty claims—not breach of contract claims. *See id.*

Worthy's corporate representative, are sufficient to create a genuine issue of material fact as to whether GFRB agreed to provide EPA registration services. *See, e.g.*, *ASD Specialty Healthcare, LLC v. Cmty. First Healthcare of Ill., Inc.*, 654 F. Supp. 3d 736, 741 (N.D. Ill. 2023) (citing UCC §§ 2-206, 2-207) (concluding that evidence of oral communications and invoices were sufficient to support the existence of a contract).

Because there is sufficient evidence for a jury to conclude that the parties formed a contract, GFRB bears the burden of negating the contract's existence. *Berkshire Invs.,* 2023 WL 5165663, at *3. Critically, GFRB presented no documentary evidence that it disclaimed responsibility for EPA registration services. GFRB points out that the invoices were sent after Worthy had already begun working with suppliers to acquire disinfectant spray. But this is a red herring: Worthy is not arguing that the invoices *constitute* the agreement, rather they are *evidence* of an agreement. Because a reasonable jury could conclude that GFRB contracted to provide GFRB EPA registration services for the disinfectant spray, the Court rejects this argument.

Next, GFRB renews its argument that De Montellano and not GFRB, was responsible for ensuring that the disinfectant spray complied with EPA registration requirements. (R. 91 at 14–15.) GFRB claims that there is no evidence that it employed Ms De Montellano. (*See id.*) Worthy, for its part, maintains that De Montellano was hired by GFRB and acted as its agent in performing EPA registration services.

Whether De Montellano was GFRB's agent is a question of fact. *Kaporovskiy v. Grecian Delight Foods, Inc.*, 787 N.E.2d 268 (Ill. App. Ct. 2003). Under Illinois law, "[t]he test of agency is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Sosa v. Onfido, Inc.*, 8 F.4th 631, 640 (7th Cir. 2021) (citation omitted). "A party can establish an implied agency relationship through circumstantial evidence." *Williams v. Off. of Chief Judge of Cook Cnty. Ill.*, 839 F.3d 617, 624 (7th Cir. 2016) (citing *C.A.M. Affiliates*, 715 N.E.2d at 783); *see also Om v. Weathers*, No. 91 C 4005, 1993 WL 408359, at *3 (N.D. Ill. Oct. 12, 1993). Although agency is a "notoriously fact-bound question, summary judgment . . . is still appropriate when the plaintiff fails 'to meet [their] burden in presenting sufficient facts to show that a genuine issue of material fact exists with respect to the agency issue.'" *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014) (quoting *Doe v. Cunningham,* 30 F.3d 879, 885 (7th Cir. 1994)).

Viewing the facts in the light most favorable to Worthy, the Court concludes that there is a genuine issue of material fact as to whether De Montellano was acting as GFRB's agent when she performed EPA registration services. Worthy presented evidence that GFRB compensated De Montellano on a per-unit basis in connection with its sale of "EPA Spray" to Worthy. (*See* Worthy's SOAF ¶ 36.) By contrast, Worthy never paid De Montellano any money. (GFRB's Resp. to Worthy's SOAF ¶ 37.) GFRB also submitted a registration request to the EPA naming De Montellano as its

"agent." (R. 106 at 121.) The EPA also sent a letter in response addressing De Montellano as Worthy's agent. (*Id.* at 119.) Finally, text messages between Jon Glick and De Montellano suggest that Jon was her main point of contact for EPA registration issues related to the disinfectant spray. (*Id.* at 131–45.) A jury could conclude based on the documentary and circumstantial evidence that GFRB was responsible for De Montellano's performance.

GFRB emphasizes that De Montellano was not employed by GFRB, but by Sialico, a third-party company. Although undisputed, this fact is not necessarily dispositive; GFRB may have used Sialico as its agent in addition to De Montellano. More fundamentally, the absence of an express agency is not necessarily fatal to Worthy's theory because a party may establish agency under a theory of apparent authority. *Cf.* Restatement (Third) Of Agency § 2.03 (2006) ("Apparent authority often coincides with actual authority."). To establish apparent authority, the party alleging the existence of the agency must prove that (1) the principal or its agent acted in a manner that would lead a reasonable person to believe that the individual allegedly at fault was an employee or agent of the principal; (2) the principal had knowledge of and acquiesced in the acts of the agent; and (3) the injured party acted in reliance upon the conduct of the principal or its agent, consistent with ordinary care and prudence. *Thomas v. Weatherguard Const. Co.*, 42 N.E.3d 21, 33 (Ill. App. Ct. 2015).

Alexandra Worthy testified that "[i]t was communicated to Worthy that De Montellano was consulting for GFRB" during "conversations that were had

throughout the process" between Jon Glick, Matt Worthy, and Bo Worthy. (Alexandra Worthy Dep. at 216:13–217:1.) Based on these representations, which may be borne out by Matt and Bo Worthy's testimony at trial, a jury could conclude GFRB's course of conduct led Worthy to believe that an agency relationship existed between GFRB and De Montellano, even if none existed in fact.

Because there is a genuine issue of material fact with respect to the existence of an agency relationship between De Montellano and GFRB, the Court denies GFRB's motion for summary judgment on Worthy's counterclaim for breach of contract related to the provision of EPA-registered disinfectant spray.

## CONCLUSION

As set forth in this Memorandum Opinion and Order, Plaintiff GFRB, LLC's motion for summary judgment on its claim for breach of the Non-Circumvention Agreement is granted, its motion for summary judgment on Worthy's counterclaim for breach of contract related to disinfectant spray is denied, and its motion for summary judgment on Worthy's damages theories is granted in part and denied in part. Worthy's motion for summary judgment is denied in its entirety. On or before September 6, 2024, the parties shall submit a joint status report setting forth the remaining issues for trial, the anticipated length of trial, and proposed trial dates in April, May, or June 2025. It is so ordered.

Date: August 26, 2024

JEREMY C. DANIEL
United States District Judge